**CERTIFIED COLOR MANUFACTURERS ASSOCIATION, et al., Appellants,**

v.

**F. David MATHEWS, Secretary of the Department of HEW, et al.**

**No. 76–1120.**

United States Court of Appeals, District of Columbia Circuit.

Argued 15 April 1976.

Decided 6 July 1976.

William D. Appler, Washington, D.C., with whom Daniel R. Thompson, Washington, D.C., was on the brief for appellants.

Charles R. McConachie, Acting Chief, Consumer Affairs Section, with whom Richard A. Merrill, Chief Counsel, Rockville, Md., Donald Beers, Thomas Scarlett, Attys., Food and Drug Administration, Earl J. Silbert, U.S. Atty., Thomas E. Kauper, Asst. Atty. Gen., and Colin R. C. Dyer, Atty., U.S. Dept. of Justice, Washington, D.C., were on the brief for appellees.

Anita Johnson and Larry P. Ellsworth, Washington, D.C., filed a brief for Public Citizens Health Research Group, as amicus curiae.

Before LEVENTHAL, ROBINSON and WILKEY, Circuit Judges.

Opinion for the Court filed by WILKEY, Circuit Judge.

WILKEY, Circuit Judge:

This appeal is a challenge to the action of the Commissioner of Food and Drugs in terminating provisional approval of the color additive FD&C Red No. 2 ("Red No. 2") pursuant to the Transitional Provisions of the 1960 Color Additives Amendments to the Federal Food, Drug, and Cosmetic Act.[1] The Certified Color Manufacturers Association and other parties (collectively referred to as "CCMA" or "appellants") are appealing from the order of the District Court granting summary judgment to the defendants-appellees and dismissing CCMA's complaint with prejudice, and thus frustrating appellants' effort to enjoin the publication of the Commissioner's order in the Federal Register. Appellants seek reversal of the District Court order, and a remand with directions to enter judgment for them and to enter an order directing the Commissioner to restore Red No. 2 to the provisional list.

Appellants urge that the District Court erred in holding that (1) the Commissioner had not acted arbitrarily or capriciously, or in excess of statutory authority, in terminating the provisional listing of Red No. 2; and (2) such action need not be preceded by notice and opportunity for comment.

We affirm the order of the District Court.

## I. BACKGROUND

### A. *Statutory Framework*

To provide a proper perspective from which to analyze the regulatory action here challenged, it is helpful first to describe the statutory framework within which the action was taken. The Color Additive Amendments of 1960 reflect a Congressional and administrative response[2] to the need in contemporary society for a scientifically and administratively sound basis for deter-

1. P.L. 86–618, 74 Stat. 399. Title I of the amendments, concerning the permanent listing provisions discussed in the text *infra,* is principally codified at 21 U.S.C. § 376. Title II, dealing with the transitional provisions, has not been codified and is contained in the note following 21 U.S.C. § 376. Its principal section is section 203.

2. The amendments were principally authored by the Department of Health, Education and Welfare. *See* 106 Cong.Rec. 14367.

mining the safety of artificial color additives, widely used for coloring food, drugs, and cosmetics. The Amendments reflect a general unwillingness to allow widespread use of such products in the absence of scientific information on the effect of these products on the human body.[3] The previously used system had some glaring deficiencies, and the 1960 Amendments were designed to overcome them. This was accomplished by the establishment of a dual system of registration: a permanent listing and a provisional listing. A color additive would be permanently listed if those desirous of producing it had proven to the satisfaction of the Commissioner that it was safe for its intended use. Generally speaking, until such listing, certain color additives were provisionally listed for a reasonable interim period pending completion of the scientific investigations necessary to make a safety determination.

The statute required that a color additive be *"deemed unsafe"* within the meaning of various sections of the Federal Food, Drug, and Cosmetic Act for use in food, drugs or cosmetics[4] *unless* the Commissioner[5] had issued a *regulation* which stated that the *additive had been found* to be suitable and safe for general use, or for a particular use.[6] The burden of establishing safety was placed on the industry. The Commissioner was required to exercise his scientific judgment[7] in determining whether safety had been proven, but was expressly precluded from listing any additive for any use if it was found to induce cancer in a human or animal.[8]

**3.** *See generally Hearings on H.R. 7624 and S. 2197 Before the House Comm. on Interstate and Foreign Commerce, 86th Cong., 2d Sess.* at 38ff. (1960) (Statement of Hon. Arthur S. Flemming, Secretary of Health, Education and Welfare) (hereafter cited as *"Hearings"*).

**4.** 21 U.S.C. § 376(a)(1)(A) provides in pertinent part:

(a) A color additive shall, with respect to any particular use (for which it is being used or intended to be used or is represented as suitable) in or on food or drugs or cosmetics, be deemed unsafe for the purposes of the application of section 342(c), 351(a)(4), or 361(e) of this title, as the case may be, unless—

(1)(A) there is in effect, and such additive and such use are in conformity with, a regulation issued under subsection (b) of this section listing such additive for such use, including any provision of such regulation prescribing the conditions under which such additive may be safely used, and (B) such additive either (i) is from a batch certified, in accordance with regulations issued pursuant to subsection (c) of this section, for such use, or (ii) has, with respect to such use, been exempted by the Secretary from the requirement of certification * * *.

**5.** Congress placed responsibility for enforcement of the statute on the Secretary of Health, Education and Welfare. He has delegated that authority to the Commissioner of Food and Drugs. 21 C.F.R. § 2.120.

**6.** 21 U.S.C. §§ 376(b)(1) and (2).

**7.** Section 376(b)(5)(A) sets out a non-exclusive list of relevant factors which the Commissioner must consider in exercising his judgment:

(i) the probable consumption of, or other relevant exposure from, the additive and of any substance formed in or on food, drugs, or cosmetics because of the use of the additive;

(ii) the cumulative effect, if any, of such additive in the diet of man or animals, taking into account the same or any chemically or pharmacologically related substance or substances in such diet;

(iii) safety factors which, in the opinion of experts qualified by scientific training and experience to evaluate the safety of color or additives for the use or uses for which the additive is proposed to be listed, are generally recognized as appropriate for the use of animal experimentation data; and

(iv) the availability of any needed practicable methods of analysis for determining the identity and quantity of (I) the pure dye and all intermediates and other impurities contained in such color additive, (II) such additive in or on any article of food, drug, or cosmetic, and (III) any substance formed in or on such article because of the use of such additive.

**8.** Section 376(b)(5)(B) provides as presently relevant:

A color additive (i) shall be deemed unsafe, and shall not be listed, for any use which will or may result in ingestion of all or part of such additive, if the additive is found by the Secretary to induce cancer when ingested by man or animal, or if it is found by the Secretary, after tests which are appropriate for the evaluation of the safety of additives for use in food, to induce cancer in man or animal, and (ii) shall be deemed unsafe, and shall not be listed, for any use which will not result in ingestion of any part of such additive, if,

In order to avoid a statutory presumption that all additives not permanently listed at the date of enactment were unsafe, Title II of the Amendments ("Transitional Provisions") provided for the continued use of commercially established additives—such as Red No. 2—on an interim basis. This was allowed only "to the extent consistent with the public health, pending completion of the scientific investigations needed as a basis for making determinations" on the safety of the additive for permanent approval.[9] This provisional listing was to expire on a "closing date" which was established as either 12 January 1963 [10] ("initial closing date"), or such later date as the Commissioner determined. The original closing date could be postponed "if in the [Commissioner's] judgment such action [was] consistent with the objective of carrying to completion in good faith, as soon as reasonably practicable" the investigation needed for making the safety determination.[11]

Throughout this transitional period, while the permanent safety determinations were being made, the Commissioner was granted broad discretionary authority summarily to terminate a provisional listing "forthwith whenever in his judgment such action [was] necessary to protect the public health." [12] During the period following postponement of the closing date, the Commissioner additionally was given broad authority to terminate that postponement "at any time" if he found that, *inter alia,* the basis for the postponement no longer existed because of a change in circumstances.[13]

It is thus apparent that after 12 January 1963 the exercise of either one of these discretionary powers would achieve the same result: the affected color additive would be removed from the marketplace; no regulation listing it for permanent approval would be in effect, and it therefore would be "deemed unsafe." [14]

---

after tests which are appropriate for the evaluation of the safety of additives for such use, or after other relevant exposure of man or animal to such additive, it is found by the Secretary to induce cancer in man or animal * * *.

9. Section 203(a)(1) provides:
    The purpose of this section is to make possible, on an interim basis for a reasonable period, through provisional listings, the use of commercially established color additives to the extent consistent with the public health, pending the completion of the scientific investigations needed as a basis for making determinations as to listing of such additives under the basic Act as amended by this Act.
21 U.S.C. § 376 (note). *See* n.1 *supra.*

10. The Act refers to "the last day of the two and one-half year period beginning on the enactment date." § 203(a)(2)(A). The enactment date was 12 July 1960; therefore, the first closing date was 12 January 1963.

11. Section 203(a)(2) provides:
    The Secretary may by regulation, upon application of an interested person or on his own initiative, from time to time postpone the original closing date with respect to a provisional listing (or deemed provisional listing) under this section of a specified color additive, or of a specified use or uses of such additive, for such period or periods as he finds necessary to carry out the purpose of

this section, *if in the Secretary's judgment such action is consistent with the objective of carrying to completion in good faith, as soon as reasonably practicable,* the scientific investigations necessary for making a determination as to listing such additive, or such specified use or uses thereof, under section 376 of the basic Act. (Emphasis added.)

12. Section 203(d)(1)(E) provides:
    The Secretary *shall,* by regulations issued or amended from time to time under this section
    * * * * * *
    (E) provide for the termination of a provisional listing (or deemed provisional listing) of a color additive or particular use thereof *forthwith whenever in his judgment* such action is necessary to protect the public health. (Emphasis added.)

13. This authority was formulated as follows:
    The Secretary *may terminate* a postponement of the closing date *at any time if he finds* that such postponement should not have been granted, or that by reason of a change in circumstances the basis for such postponement no longer exists, or that there has been a failure to comply with a requirement for submission of progress reports or with other conditions attached to such postponement.
Section 203(a)(2) (emphasis added).

14. *See* 21 U.S.C. 376(a)(1), *supra* n.4.

In the instant case, the Commissioner exercised both of these powers. He terminated the postponement of the closing date of Red No. 2, and additionally terminated its provisional listing.

### B. Agency Action

Red No. 2 is a petroleum derived color additive widely used in this country artificially to create or brighten the white, brown, purple, or red colors of various foods, drugs, and cosmetics. It is used alone or in combination with other compounds to attain the desired color. It has no apparent nutrient value and its primary function is to enhance the eye appeal of a particular product.[15] It has been widely used in this country under federal regulatory control for nearly seventy years.[16] Since the initiation of more sophisticated scientific investigations following enactment of the 1960 Color Additive Amendments, it has failed to receive FDA permanent approval for safety.

Acting pursuant to his authority under the Transitional Provisions, the Commissioner has postponed the closing date a total of fifteen times, either at the request of interested parties or on his own initiative.[17] The most recent postponement occurred 5 January 1976 and was to expire 30 September 1976.[18] A petition for permanent listing pursuant to 21 U.S.C. § 376 has been under active consideration since late 1968,[19] but had not been acted on prior to the action here challenged.[20] At one point the agency was on the verge of affirmatively acting on the petition;[21] before such action could be taken,[22] however, information became available on several studies undertaken in the Soviet Union which raised new concerns over the safety of Red No. 2. One study concluded that amaranth, the generic name for Red No. 2, was poisonous to the reproductive organs of laboratory rats; the remaining studies concluded that amaranth was carcinogenic, that is, it caused cancer.

**15.** *Hearings* at 108 (Statement of Representative James J. Delaney of New York, a principal sponsor of the legislation). This is not to say that society has attached no value whatsoever to color additives such as Red No. 2. For example, cosmetics are designed and purchased for the very purpose of imparting color. Moreover, pharmacists, physicians and patients have come to depend on additives to "color code" various drugs for ready identification. *See generally,* S.Rep. 795, 86th Cong., 1st Sess. 11.

**16.** It was one of the first seven color additives approved for use in food in 1907 under the terms of the Pure Food and Drug Law of 1906, Pub.L. 58–384, 34 Stat. 768.

**17.** Only the most recent postponement is of concern to us here. While there appears to have been general concern with the safety of Red No. 2, see text infra, much of the delay has been caused by a dispute between manufacturers and the FDA over the need to provide the agency with formulations of the cosmetics in which various color additives, including Red No. 2, are used. Litigation over this issue began in 1963 and was partially resolved in 1969 with the Second Circuit's decision in *Toilet Goods Ass'n v. Finch,* 419 F.2d 21 (2d Cir. 1969). There the court determined that the agency did not have general authority to require submission of cosmetic formulations in all circumstances, but could require such information in special circumstances. The record

does not disclose precisely how the problem was resolved as to Red No. 2, and the issue is not before us. For a general historical discussion of the postponement of the closing date for Red No. 2, see Report of the Comptroller General of the United States, "Need To Establish The Safety Of Color Additive FD&C Red No. 2" 5–10 (October 20, 1975) (lodged with the court by *amicus* Public Citizen's Health Research Group).

**18.** 41 Fed.Reg. 754.

**19.** The petition was first tendered by the Certified Color Industry Committee, the predecessor of appellant CCMA, on 17 September 1965. It was not accepted for filing, however, until 1968 largely because of the cosmetic formulation dispute. *See* n.17 *supra.*

**20.** The petition was formally denied on 9 April 1976. 41 Fed.Reg. 15053.

**21.** On 5 March 1969 the Petitions Review Branch, Division of Pharmacology and Toxicology, issued its evaluation of the petition and concluded that Red No. 2 was safe for "general use in food, vitamin supplements, and drugs," but recommended against permanent approval for use in cosmetics pending resolution of the formulation dispute. J.A. at 51–52.

**22.** J.A. at 87.

While FDA scientists questioned the validity of the Soviet tests,[23] the new studies pointed out the absence of information on the effects of Red No. 2 on reproductive physiology and raised concern over its possible carcinogenicity. Accordingly, the FDA undertook its own chronic feeding study over a two-and-one-half year period in which Osborne-Mandel rats were fed Red No. 2 in their diet at concentrations of 3%, 0.3%, 0.003%, and 0%. The duration of that study and the follow-up evaluations have been the primary reason for postponing the closing date of Red No. 2's provisional listing for the last several years.

The most recent postponement came after a meeting of the Toxicological Advisory Committee ("TAC") established by the Commissioner pursuant to the statute [24] to make recommendations on the safety of Red No. 2. At its November 1975 meeting the TAC saw no reason to recommend against postponing the closing date, thus continuing the period for evaluation. It recognized that the feeding study was severely flawed because the dosage levels of Red No. 2 in the various rat groups had not been maintained and because there had been substantial tissue loss due to autolysis. It nevertheless believed that portions of the study could still be used to establish safety [25] and recommended continuing review, including a biostatistical study of the data.[26] Accordingly, on 14 November 1975 the Commissioner published notice of his intent to postpone the closing date of the provisional listing of Red No. 2, along with all other provisionally listed additives, stating as his reason that "[r]eview of the data submitted to establish [safety] is underway . . . ." [27] After receiving no adverse comments, the closing date was formally postponed on 5 January 1976.[28]

In the interim, Dr. D. W. Gaylor had performed the biostatistical analysis requested by the TAC. In a memorandum to the Chairman of the TAC, dated December 1975, Dr. Gaylor presented his analysis and concluded that "it appears that feeding FD&C Red No. 2 at a high dosage results in a statistically significant increase in a variety of malignant neoplasms among aged Osborne-Mandel female rats." [29] In preparation for his statistical analysis, Dr. Gaylor had isolated malignant neoplasms found in 44 rats in the low dosage group and in 44 rats in the high dosage group. His analysis resulted in findings that (1) for those animals dying before the end of the study, that is, before the passage of 131 weeks, the proportion of those dying with cancer in the high dosage group was not significantly higher statistically than those dying with cancer in the low dosage group; [30] (2) for those rats sacrificed at the end of the study and found to have malignant neoplasms, it was determined that there was less than a 5%, or a 4%, probability that the higher frequency of malignant neoplasms found in the high dosage group would be due to random occurrence; [31] and (3) in evaluating

**23.** The Soviet reports did not specify the composition of the amaranth paste employed and, therefore, it may not have conformed to FDA specifications for Red No. 2. Additionally, FDA scientists were concerned with two unusual circumstances present in the Soviet studies: rats in the control groups had no tumors whatsoever; and malignant tumors were found in a variety of organs, an unusual result because carcinogens generally are believed to have a target organ. J.A. 66–67, 87–88.

**24.** 21 U.S.C. § 376(b)(5)(c).

**25.** *See e. g.,* J.A. at 98–101.

**26.** It additionally recommended "confirmatory pathologic diagnosis of animal tissue slides taken from the chronic study . . . , as well as those from earlier studies, if available," and a "detailed analysis of the chemical composition of the color additive as currently marketed." 41 Fed.Reg. 5824.

**27.** 40 Fed.Reg. 53039.

**28.** 41 Fed.Reg. 754.

**29.** J.A. at 109.

**30.** Of the animals dying before the end of the study, 7 of 23 from the high dosage group were found to have cancer, while from the low dosage group, 4 out of 30 had cancer. J.A. 107–08.

**31.** At terminal sacrifice, 14 rats in the low dosage group and an equal number in the high dosage group were found not to have cancer; however, seven rats in the high dosage group

the experiment for all animals (interim deaths and terminal sacrifice), it was found that there was less than a 2% probability that the higher frequency of malignant neoplasms found in the high dosage group would be due to random occurrence.[32]

The statistical relationship thus uncovered was viewed as a matter of "great concern,"[33] and a special ad hoc "Working Group"[34] was convened on 14 January 1976 to review the study. It submitted a report to the Commissioner on 16 January 1976 in which it concluded: (1) given the deficiencies in the chronic feeding study, "inferences drawn by Dr. Gaylor represent the minimum possible observable differences," (2) the chronic feeding study "could never be used as a demonstration of safety," and (3) the principles of the statistical analysis were accepted, but the strength of any conclusions would depend on reanalysis "using a slight redefinition of tumor types."[35]

Following receipt of this report, on 19 January the Commissioner prepared, and gave notice of intent to publish, a regulation to terminate the provisional listing of Red No. 2.[36] The order was signed on 23 January, to become effective on publication in the Federal Register. Prior to publication, CCMA filed its complaint in the District Court and was granted a temporary restraining order the next day. After consideration of the papers filed, the administrative record, and oral argument of the parties, the District Court vacated the temporary restraining order, denied CCMA's request for a preliminary injunction, granted summary judgment to the defendants-appellees, and dismissed the complaint with prejudice.[37]

Following CCMA's unsuccessful attempts to obtain a stay from this court and the Supreme Court, the regulation was published on 10 February 1976.[38] The Commissioner therein reviewed the general progression of events leading to the most recent postponement of the closing date, the Gaylor analysis and the Working Group's report,

and no rats in the low dosage group were found to have cancer. The one degree of freedom chi-squared value corrected for continuity was found to be statistically significant at the $P < .05$ level. Application of "Fisher's exact test" resulted in a two-sided significance level of $P < .04$. J.A. at 108.

**32.** The rates were statistically significant at the $P < .02$ level. *Id.*

**33.** Memorandum from the Director of the National Center for Toxicological Research to the Chairman of the Toxicological Advisory Committee (13 January 1976), J.A. at 111.

**34.** The "Working Group" was composed of scientists from FDA, the National Cancer Institute, and the TAC. Appellees' Brief at 6.

**35.** J.A. at 138–140. The report summarized the statistical evidence as follows:

The evidence from this experiment demonstrating that FD&C Red No. 2 *is* a carcinogen is twofold:

1. A statistically significant increase in malignant tumors in females in the high-dose group versus low dose ("controls").
2. A possible dose-response relationship in females using all dose groups.

The evidence from this experiment not supporting the carcinogenicity of FD&C Red No. 2 is fourfold:

1. No statistically significant increase in malignant tumors was demonstrated in male animals.
2. No statistically significant events are observed if one aggregates all tumor types.
3. No unusual or unique tumor types were observed in the test animals.
4. No single tumor type showed an increase over that observed in the control animals.

*Id.* at 139 (emphasis in original). It additionally recommended that the statistical findings be reviewed by the TAC in an effort to "agree on the quantity and quality of pertinent information that can be extracted" from the feeding study. *Id.* at 140.

**36.** J.A. at 18.

**37.** J.A. at 153.

**38.** 41 Fed.Reg. 5823. On 9 February a motions panel of this court temporarily stayed publication of the regulation in order to afford an opportunity more fully to consider the admittedly complex issues involved. Appellees were unable to stop publication, however, and the regulation issued on 10 February. Appellees, by notice given 13 February, amended the effective date of the regulation in accordance with the court's order. 41 Fed.Reg. 6774. Following oral argument on the motion for stay, this court vacated the temporary stay and denied the motion on 11 February.

and concluded that provisional listing of Red No. 2 was "no longer appropriate."[39] Accordingly, he terminated the provisional listing and additionally terminated the postponement of the closing date.

He concluded that termination of the listing was "necessary to protect the public health" because of the concern engendered by the Gaylor analysis and because the available data did not overcome that concern. The Commissioner stated:

. . . The provisional listing of FD&C Red No. 2 should be terminated because such action is necessary to protect the public health, in that questions have been raised about the safety of the color additive and the available data do not permit a determination of safety.[40]

He terminated the postponement of the closing date on a finding that the basis for the last postponement no longer existed because of the change in circumstances brought about by the Gaylor analysis and the conclusion of the Working Group that the feeding study could not be used to demonstrate safety. He further stated:

This postponement was based on the assumption that the studies being evaluated *could* establish the safety of the color additive. Since it has now become clear that *the studies cannot satisfactorily resolve* this issue, the Commissioner finds that *the basis for the postponement no longer exists* and hereby terminates the postponement of the closing date in accordance with section 203(a)(2) of the transitional provisions of the Color Additive Amendments of 1960.[41]

"Cessat ratione, cessat" postponement.

Each action resulted in the termination of the provisional listing of Red No. 2. If we find, therefore, that the District Court was correct in determining that the Commissioner acted properly in taking either action, the effect is to sanction the general conclusion of the Commissioner.

## II. SCOPE OF REVIEW

The Transitional Provisions are silent as to the scope of review of agency action such as is involved here. Provision is specifically made for the review of a termination of a provisional listing, but only for actions taken prior to 12 January 1963. For a decision on termination made before that time, judicial review was allowed only after an aggrieved party had two opportunities to present evidence supportive of his position in post-determination agency proceedings. After thus failing to convince the Commissioner that he should reinstate a provisional listing, a party in the position of appellants could file a petition for review in an appropriate court of appeals where review would be had only on a claim that the Commissioner's determination was not based on a "fair evaluation of the entire record."[42]

**39.** 41 Fed.Reg. at 5823 (as foreshadowed by the HEW news release of 19 January 1976, n.36 *supra*).

**40.** *Id.* at 5824.

**41.** *Id.* (emphasis added).

**42.** Sections 203(d)(2)(B) and (C) provide in relevant part:

"(B) If the Secretary, by regulation—

"(i) has terminated a provisional listing (or deemed provisional listing) of a color additive or particular use thereof pursuant to paragraph (1)(E) of this subsection;

\* \* \* \* \* \*

any person adversely affected by such action may, prior to the expiration of the period specified in clause (A) of subsection (a)(2) of this section, file with the Secretary a petition for amendment of such regulation so as to revoke or modify such action of the Secretary, but the filing of such petition shall not operate to stay or suspend the effectiveness of such action. Such petition shall, in accordance with regulations, set forth the proposed amendment and shall contain data (or refer to data which are before the Secretary or of which he will take official notice), which show that the revocation or modification proposed is consistent with the protection of the public health. The Secretary shall, after publishing such proposal and affording all interested persons an opportunity to present their views thereon orally or in writing, act upon such proposal by published order.

"(C) Any person adversely affected by an order entered under subparagraph (B) of this paragraph may, within thirty days after its publication, file objections thereto with the Secretary, specifying with particularity the provisions of the order deemed objectionable, stating reasonable grounds for such objec-

■ No explanation seems readily apparent for this absence of specific review authority after 12 January 1963. No provision, however, indicates a specific intent to deprive an aggrieved party of the right to seek judicial review for any termination taken after the postponement of the original closing date. Although not urged upon us, we have independently given consideration to the possibility that Congress intended to withhold judicial review and create unreviewable discretionary authority [43] in the Commissioner. We have determined that given the general presumption of reviewability [44] and the failure of the agency which principally authored the statute [45] to interpret it as precluding review, jurisdiction did in fact exist in the District Court to review the agency action under the Administrative Procedure Act.[46]

■ Accordingly, the appropriate standard for review of the evidence involved in the challenged agency action is that provided by section 10(e)(2)(A) of the Administrative Procedure Act,[47] which requires a district court to "hold unlawful and set aside agency actions, findings and conclusions" which are found to be "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." [48] The District Court followed this standard; the parties agree that it should be applied, but predictably disagree over the result of such review.

■ It is well recognized that this standard of review is a narrow one which presumes agency action to be valid.[49] It requires that a court not substitute its judgment for that of the agency, so long as a rational basis exists, or may be reasonably discerned, for the agency determination.[50]

tions, and requesting a public hearing upon such objections. The Secretary shall hold a public hearing on such objections and shall, on the basis of the evidence adduced at such hearing, act on such objections by published order. Such order may reinstate a terminated provisional listing, or increase or dispense with a previously established temporary tolerance limitation, or make less restrictive any other limitation established by him under paragraph (1) or (3) of this subsection, only if in his judgment the evidence so adduced shows that such action will be consistent with the protection of the public health. An order entered under this subparagraph shall be subject to judicial review in accordance with section 701(f) of the basic Act [section 371(f) of this title] except that the findings and order of the Secretary shall be sustained only if based upon a fair evaluation of the entire record at such hearing. No stay or suspension of such order shall be ordered by the court pending conclusion of such judicial review."

43. 5 U.S.C. § 701(a)(2).

44. *Abbot Laboratories v. Gardner*, 387 U.S. 136, 140, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *Harper v. Levi*, 171 U.S.App.D.C. 321, 520 F.2d 53, 67 (1975); *Scanwell Laboratories, Inc. v. Shaffer*, 137 U.S.App.D.C. 371, 424 F.2d 859, 874 (1970); 4 K. Davis, Administrative Law Treatise § 28.16 (1958); *See generally* Saferstein, *Nonreviewability: A Functional Analysis of "Committed to Agency Discretion,"* 82 Harv. L.Rev. 367 (1968); Berger, *Administrative Arbitrariness and Judicial Review*, 65 Col.L.Rev. 55 (1965).

45. *See generally* 106 Cong.Rec. 14362–14369 (1960).

46. 5 U.S.C. §§ 701–706.

47. 5 U.S.C. § 706(2)(A).

48. We have also evaluated appellant's contentions with reference to sections 10(e)(2)(C) and (D) of the Administrative Procedure Act, 5 U.S.C. § 706(2)(C) and (D), which require a court to set aside agency action found to be either "in excess of statutory jurisdiction, authority, or limitations," or "without observance of procedure required by law." On the facts of this case, we find no difference in analysis or result.

49. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

50. *Id.* at 416, 91 S.Ct. 814; *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974). In a substantial evidence case, we have appropriately noted our narrow function:

In the case at bar our task is made somewhat simpler than the agency's by adhering conscientiously to the proper scope of judicial review of administrative action, *i. e.,* we as a court are confronted with a problem in administrative law, not in chemistry, biology, medicine, or ecology. It is the administrative agency which has been called upon to hear and evaluate testimony in all scientific fields relevant to its ultimate question of permis-

We "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." [51]   It is only where there is no rational nexus between the facts found and the choices made that a court is authorized to set aside the agency determination.  Our task is at an end when, after conscientiously adhering to this standard, we find that such a nexus exists.

Application of this standard is made even easier where as here the discretionary authority is very broad and the statutory limitations on the exercise of that authority are relatively broad as well.   The breadth of this discretion is highlighted by the following unequivocal language contained in a letter sent by the Secretary of Health, Education and Welfare to the Speaker of the House of Representatives upon the submission of certain amendments to the proposed Color Additive Amendments:

> Were it not for this discretionary or judgmental aspect of the transitional provisions, it is doubtful that we could have considered submission of the bills as a departmental proposal compatible with our responsibility for the protection of the public health. [52]

[4]   To the extent that the instant case involves questions of statutory construction, our review is guided by the considerable deference traditionally owed the interpretation of a statute by the head of the agency charged with its administration. [53]   Statutory construction is, of course, more properly the assigned role of a court of law.   Nevertheless, we believe that the traditional deference is heightened when the statutory interpretation involves a remedial statute designed to protect the public health and principally authored by the implementing agency.

## III.   THE ISSUES ON APPEAL

### A.   Termination of the Postponement of the Closing Date

[5]   Appellants urge that the District Court erred in holding that the Commissioner had not acted in an arbitrary and capricious manner, nor in excess of statutory authority, in terminating the postponement of the closing date.   In support of their position they argue that, under the transitional provisions, a postponement of the closing date taken to allow for the evaluation of data for a determination of safety may not be terminated on the basis of a change in "circumstances" when in fact the evaluation has not ceased at the time of termination. [54]   While this argument is initially appealing, we believe that it is based on a much too confined interpretation of the statute and of the Commissioner's actions.

It will be recalled that the statutory authority to grant a postponement is couched in broad, discretionary language and allows for the interplay of judgmental factors. [55]   While the statute speaks in terms of completing the necessary "scientific investigations," there is also a pervasive legislative gloss that the postponement must also be consistent with the protection of the public health. [56]

sion or prohibition of the sale and use of DDT.  The EPA Administrator had an opportunity to make a careful study of the record of seven months of public hearings and the summaries of evidence prepared for him, heard oral argument, and now has arrived at a decision to ban most uses of DDT.  It is *his* decision which we must review; we are not to make the same decision ourselves.  We are concerned with how he did it and on how much evidence.
*Environmental Defense Fund, Inc. v. EPA,* 160 U.S.App.D.C. 123, 489 F.2d 1247, 1252 (1973) (emphasis in original).

51.   *Citizens to Preserve Overton Park v. Volpe, supra,* 401 U.S. at 416, 91 S.Ct. at 823.

52.   106 Cong.Rec. at 14367.

53.   *United States v. Bacto-Unidisk,* 394 U.S. 784, 792, 89 S.Ct. 1410, 22 L.Ed.2d 726 (1968); *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).

54.   Appellants' Brief at 38.

55.   *See* n.11 *supra.*

56.   The House Report on the 1960 amendments states:

> In general, a provisional listing would terminate no later than the end of the 2½-year period beginning on the date of enactment.

Here the Commissioner had postponed the closing date on the assumption that studies in progress or under evaluation could establish the safety of Red No. 2. At that time, review of the results of the feeding study had not uncovered any evidence indicating that Red No. 2 had exhibited carcinogenic effects. Dr. Gaylor's biostatistical analysis had not yet become known to the Commissioner. Once it had become known, and the Working Group had found that, in viewing it in conjunction with the generally flawed nature of the feeding study, the study could not be used to prove safety, the Commissioner determined in his judgment that a change of circumstances had occurred. The District Court held that this finding was not arbitrary and capricious, and we agree.

We cannot accept the thrust of appellant's argument that the "change in circumstances" standard is so restrictive as to *preclude absolutely* the Commissioner from taking discretionary action prior to the completion of the evaluation which gave rise to the postponement.[57] It is reasonable to assume, as the Commissioner did,[58] that the standard is broad enough to embrace situations such as present here, where evidence suggestive of carcinogenicity is uncovered following postponement and it thereafter appears that the principal study under review cannot be used to assess safety. Admittedly, *all studies* performed on Red No. 2 were under evaluation, but the *primary* study at issue was the feeding study. Once it became apparent to the Commissioner that the study could not support a finding of safety and, indeed, was

suggestive of carcinogenicity, there was a rational basis for terminating the postponement of the closing date.[59]

Appellants nevertheless argue that the Commissioner exceeded his statutory authority by considering the factor of safety.[60] They posit the theory that safety considerations are patently irrelevant under the Transitional Provisions and that they only enter into the decisionmaking process under the Permanent Provisions of the Amendments. They urge that since provisional listing for commercially established additives, such as Red No. 2, was automatic, a "presumption of safety" attached to the additive which could only be overcome by a "finding of hazard to health," or unless the postponement was otherwise terminated.[61]

We find this argument to be without merit since it rests on a fundamental misconstruction of the plain meaning of the statute. Initially it should be noted that the "presumption of safety" was not predicated on then existing evidence, but rather was a statutory presumption deemed necessary to avoid an automatic ban on the additive upon the date of the enactment.[62] As discussed in Part I(A) of this opinion, it was always subject to broad discretionary controls. Additionally, there is no mention anywhere in the statute that a "hazard" to health must exist before discretionary action may be taken. The standard is the much less restrictive one of action "necessary to protect the public health."[63]

Moreover, postponement of the closing date is expressly related to safety considerations and presupposes that the studies

---

However, where necessary to complete the scientific testing required for a particular additive, the Secretary could extend this period with respect to a particular color additive or use, *if this is consistent with the protection of the public health* and with the objective of completing these tests as soon as practicable. H.R.Rep. No. 1761, 86th Cong., 2d Sess. 16 (1960) U.S.Code Cong. & Admin.News 1960, pp. 2887, 2897 (emphasis added).

57. Legislative history is of no assistance in this regard since it merely repeats the statutory standards without comment.

58. *Cf., Train v. Natural Resources Defense Council, Inc.,* 421 U.S. 60, 67, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975).

59. *Bowman Transportation, Inc. v. Arkansas-Best Freight Systems, Inc., supra,* 419 U.S. at 286, 95 S.Ct. 438.

60. Brief at 39–40.

61. *Id.* at 40.

62. *See* n.9 *supra.*

63. *See* Part III(B) of this opinion, *infra.*

under evaluation *could* support a finding of safety. It appears inevitable, then, that consideration of the "basis" for postponement in making a termination decision necessarily involves reevaluation of that factor. It is a fundamental rule of statutory construction that legislative enactments be construed in a manner designed to give effect to all parts while avoiding a result contrary to the apparent intent of the Congress.[64] The argument advanced by appellants would clearly be inconsistent with that rule.

### B. Termination of the Provisional Listing

The principal issue raised by appellants is that the District Court erred in failing to find that the Commissioner had acted arbitrarily and capriciously, and in excess of statutory authority in terminating the provisional listing of Red No. 2. We shall first consider the statutory argument and then the evidentiary considerations.

The primary thrust of appellants' statutory argument is that the standard authorizing the Commissioner to act "forthwith whenever in his judgment such action is necessary to protect the public health"[65] requires that there be an actual threat to the public,[66] amounting for all practical purposes to an imminent health hazard.[67] We believe this argument is without foundation. When Congress has intended so to restrict the discretion available to an agency to take regulatory action similar to that involved here, it has not hesitated to indicate that intent by the inclusion of appropriately restrictive language.[68] Here Congress attached no such "qualifiers" and chose instead to provide for a much broader standard, designed, we think, to allow for precautionary or prophylactic responses to perceived risks. There is nothing in the statute or its legislative history to indicate that Congress intended to restrict regulatory action to situations where there was a substantial likelihood of serious harm to the public.[69] The overall Congressional intent appears to be to the contrary.

Indeed, it appears that Congress clearly recognized that the need for broad authority was both necessary and desirable, given the relative value attached to color additives.[70] It should be noted that we deal here with a product which has, literally and accurately, a cosmetic value. Accordingly, there is no precise statutory indication as to the level of concern necessary to justify, in the Commissioner's judgment, the taking of protective action.

Nor is the legislative history much more indicative. The only clue is contained in a letter written to the Speaker of the House of Representatives by the Secretary of Health, Education and Welfare expressing, *inter alia*, opposition to the suggestion of a witness at the Committee hearings that termination be allowed only on the basis of "substantial probative evidence." In successfully urging retention of the present broad standard, the Secretary stated that termination could occur when there was a *"substantial question as to . . . safe-*

---

**64.** 2A C. D. Sands, Sutherland Statutory Construction §§ 46.06 and 46.07 (4th ed. 1973).

**65.** Section 203(d)(1)(E).

**66.** Brief at 28.

**67.** Reply Brief at 14 n.22.

**68.** *See, e. g.,* 21 U.S.C. § 454(c) ("clearly endanger"); 33 U.S.C. § 1364 ("imminent and substantial endangerment"); 7 U.S.C. § 136d(b) ("imminent hazard to the public").

**69.** Cf., *Environmental Defense Fund, Inc. v. EPA,* 150 U.S.App.D.C. 348, 465 F.2d 528, 540 (1972).

**70.** *See, e. g., Hearings* at 108 (Statement of Representative Delaney):

> I can say that in this matter of color additives there is a reason why we should have a strong bill. Some food additives serve a useful purpose. They have helped to develop and improve our food supply in many ways.
>
> However, color additives provide no nutrient value. They have no value at all, except so-called eye appeal. We should be particularly careful with them, therefore. They add nothing in any other way.

*ty."* [71] Counsel for appellants would have us read this statement as creating a "legislative gloss" that termination is authorized only "where the evidence of harm [is] 'substantial.'" [72] Clearly no such interpretation of the Secretary's remark is justified.

Furthermore, a court must keep in mind that the Commissioner's action is in the nature of a preliminary assessment of available information and that the underlying data will be thoroughly reviewed in the context of a post-determination formal hearing. In the circumstances presented here, where the termination occurs after the initial closing date, that administrative review will take place during the formal hearings following denial of the petition for permanent listing. [73]

Our review of the record, in light of the broad discretion conferred on the Commissioner, convinces us that there was no abuse of discretion in terminating the provisional listing of Red No. 2. The information available to him indicated a statistically significant relationship between high dosages of Red No. 2 and the occurrence of cancer in aged female rats. That relationship concededly did not establish conclusive proof that Red No. 2 was a carcinogen, but it was at least suggestive of it, and that statistical analysis was later confirmed, albeit at lower levels of significance. [74] Moreover—and this was the angle from which he was to view these findings—he had been advised that the principal study under evaluation *could not* be used to *establish* safety. Based on this information, he determined in the exercise of his scientific judgment that a question as to the safety of the additive existed sufficient to warrant termination. We cannot say that this was an irrational choice, nor can we say that it was beyond his statutory authority.

Courts have traditionally recognized a special judicial interest in protecting the public health, [75] particularly where "the matter involved is as sensitive and frightladen as cancer." [76] Where the harm envisaged is cancer, courts have recognized the need for action based upon lower standards

**71.** 106 Cong.Rec. 14367 (emphasis added). The Secretary wrote:

> The amendment is unacceptable to us. As above indicated, the whole purpose of the provisional listing plan is, on the one hand, to permit (so far as considered consistent with public health protection) the temporary use of established colors while the scientific tests are being carried forward to completion, and on the other hand—since under the transitional provisions there is admittedly no adequate scientific evidence for definitive conclusions—to allow play for the Secretary's judgment in taking necessarily summary action for protecting the public health on the basis of such data as are available to him. The proposed amendment is designed to frustrate this key element of the transitional plan of the bill. It seems appropriate to add that retention of the present provisions would also make it easier for us to grant a provisional listing in the first place, since we could quickly terminate it if we found that there was a substantial question as to its safety.

**72.** Brief at 25.

**73.** Cf., *Environmental Defense Fund, Inc. v. EPA,* 167 U.S.App.D.C. 71, 510 F.2d 1292, 1298 (1975). The legislative history evinces a clear intent to allow for re-evaluation of data after the decision is made. *See* 106 Cong.Rec. 14366–14367. Section 376 provides as much for a permanent listing determination, and Section 203(d)(2)(C) allows for agency review after a termination of a provisional listing has become effective if the termination was before 12 January 1963. The fact that the statute does not specifically provide for such post-determination review of provisional listing decisions now does not detract from this intent. It merely heightens the likelihood that the review will occur under the section 376 procedures. It is quite probable that Congress believed that termination of a provisional listing would trigger the denial of permanent listing and the accompanying procedures. Prior to 12 January 1963 it was unlikely that a petition for permanent listing would have been filed. After that date such petition could reasonably be expected to be on file.

**74.** Minutes of Toxicology Advisory Committee Meeting, March 8–9, 1976 at 6 (Attached as Exhibit A to Appellees' Brief).

**75.** *Environmental Defense Fund, Inc. v. Ruckelshaus,* 142 U.S.App.D.C. 74, 439 F.2d 584, 598 (1971).

**76.** *Environmental Defense Fund, Inc. v. EPA, supra,* 465 F.2d at 538. We note that fear of cancer played a significant role in the enactment of the Color Additive Amendments. *See* 21 U.S.C. § 376(b)(5)(B), *supra* n.8.

of proof than otherwise applicable.[77] While we might not have arrived at the same conclusion as the Commissioner did, we cannot say that the District Court was obligated to hold, as a matter of law, that the action was irrational under the circumstances. There was a rational nexus between the facts found and the decision made.

Therefore, in light of the broad discretionary authority available to the Commissioner, and our necessarily limited role as judges, we affirm the District Court's holding on this issue.[78] We note, however, that the Commissioner has denied appellants' petition for permanent listing, and we assume that this has triggered a formal proceeding before the agency which will result in a new order being issued based on a complete reevaluation of the evidence. That is a separate proceeding from which there will arise another opportunity to seek judicial review.[79]

### C. *The Procedural Issue*

Appellants lastly urge that the District Court erred in finding that the notice and comment provisions of the Administrative Procedure Act[80] did not apply to the actions challenged.[81] They urge that since it

is generally accepted that the Act "should be received hospitably,"[82] and that exclusions from the rule are rarely found, the District Court should be reversed and the Commissioner thereby obligated to begin the termination process anew by providing notice and allowing for opportunity to comment.[83]

■ The arguments presented in support of this proposition are without merit. The Commission is authorized to terminate the postponement of the closing date "at any time"[84] and may terminate a provisional listing "forthwith."[85] Such discretionary authority, expressly designed to avoid any time limitations, are "so inconsistent with any notice-and-comment requirement as to compel the conclusion that a pre-determination hearing cannot be implied from the terms of the statute."[86]

Lastly, the fact that the Commissioner gave notice and provided opportunity for comment when he postponed the closing date and when he proposed the establishment of tolerance limitations on the use of Red No. 2 establishes no precedent or parallel for our purpose here. A review of the statutory provisions authorizing such actions indicates that they are not controlled by the terms "at any time" or "forthwith."

---

77. See e. g., *Reserve Mining Co. v. EPA*, 514 F.2d 492 (8th Cir. 1975) (*en banc*) ("reasonable medical concern").

78. We have considered the remaining arguments submitted on this issue and they do not dissuade us from our conclusion.

79. *See* § 203(d)(2)(D) ("A regulation, provisional listing or termination thereof . . . under this section shall not be the basis for any presumption or inference in any proceeding under section [376] (b) or (c) of the basic Act.").

80. Sections 4(b) and (c) of the act, 5 U.S.C. § 553(b) and (c), provide in pertinent part:
(b) General notice of proposed rule making shall be published in the Federal Register * * *, [and]
(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation.

81. In its oral opinion, the district court stated:
I certainly cannot read into the provisions of the color additive statute as they relate to provisional listings or termination of provisional listings any requirement under the Administrative Procedure Act for notice and comment.
J.A. at 150.

82. *Pickus v. United States Board of Parole*, 165 U.S.App.D.C. 284, 507 F.2d 1107, 1111 (1974).

83. Brief at 41–46.

84. Section 203(a)(2).

85. Section 203(d)(1)(E).

86. *Dolph Briscoe, Governor of the State of Texas, et al. v. Edward H. Levi, United States Attorney General, et al.*, 175 U.S.App.D.C. 297, at 304–05, 535 F.2d 1259, at 1266–67 (1976). The legislative history cited by appellants for the contrary position, Brief at 43–44, does not overcome this clear statutory intent.

## IV. CONCLUSION

For the above-stated reasons, the judgment of the District Court is

*Affirmed.*