Peter H. FORSHAM, M.D., et al., Plaintiffs,

v.

Joseph A. CALIFANO, Jr., Defendant.

Civ. A. No. 77-1478.

United States District Court, District of Columbia.

Oct. 25, 1977.

Memorandum and Order Oct. 25, 1977.

Neil L. Chayet, Washington, D. C., for plaintiffs.

Tobey W. Kaczensky, Asst. U. S. Atty., William Vodra, Asst. Gen. Counsel, Dept. of Health, Education and Welfare, Washington, D. C., for defendant.

## MEMORANDUM AND ORDER

CORCORAN, District Judge.

### I

*Background*

Plaintiffs are seven physicians who specialize in the treatment of diabetes and six diabetic patients taking phenformin hydrochloride (phenformin) prescribed by their physicians as part of their diabetic therapy.

Phenformin is an orally administered drug designed to control blood sugar levels in patients with adult-onset diabetes who are not dependent on insulin and who cannot or will not reduce their daily caloric intake. Phenformin allows such diabetics to control their condition with fewer dietary restrictions and to delay the time when they must begin taking insulin.

The defendant is the Secretary of Health, Education and Welfare (the Secretary) who, pursuant to Section 505(e) of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. 355(e), (the Act) has suspended new drug applications (NDA's) for phenformin on grounds that the drug poses an "imminent hazard." The pertinent language of 21 U.S.C. § 355(e) states:

"That if the Secretary . . . finds that there is an imminent hazard to the public health, he may suspend the approval of such [new drug] application immediately, and give the applicant prompt notice of his action and afford the applicant the opportunity for an expedited hearing under this subsection; but the authority conferred by this proviso to suspend the approval of an application shall not be delegated."

Plaintiffs seek to enjoin the Secretary from implementing his suspension order. They also seek a declaratory judgment that the suspension order is outside the scope of the Secretary's authority, is arbitrary and capricious, and violates their Fifth Amendment due process rights, the Administrative Procedure Act and the Food and Drug Administration's (FDA's) regulations.[1]

The key events precipitating the issuance of the suspension order and subsequent filing of this suit are as follows:

1. On April 22, 1977 the Health Research Group (HRG) a consumer organization petitioned the Secretary to suspend the distribution of phenformin contending that it constituted an "imminent hazard to the public health" under the Act. Underlying the HRG contention were reports that the use of phenformin caused inordinately high instances of lactic acidosis, an often-fatal metabolic disorder in which abnormal amounts of lactic acid accumulate in the blood.

2. The Secretary referred the matter to the Food and Drug Administration (FDA) for comment on April 29, 1977. The FDA issued a Notice of Public Hearing (42 F.R. 21845) to be held May 13, 1977.

3. On May 6, 1977 the FDA Bureau of Drugs commenced formal proceedings to withdraw FDA approval of phenformin

1. In addition to Plaintiff's Complaint, Motion for a Preliminary Injunction and Memorandum of Points and Authorities in Support thereof, the Court also has before it Defendant's Motion for Summary Judgment and Memorandum of Points and Authorities in Support thereof, Statement of Material Facts As to Which There is No Genuine Issue, and Proposed Findings of Fact and Conclusions of Law, as well as Plaintiff's Opposition thereto, Statement of Material Facts as to Which There is Genuine Issue, and Proposed Findings of Fact and Conclusions of Law. Oral argument was had on the various motions.

(42 F.R. 23170). Hearings were scheduled to commence October 5, 1977.[2]

4. During the May 13th hearing information was presented by the manufacturers of phenformin as well as various professional medical associations and other interested parties including four of the plaintiffs in this case.

5. On June 27, 1977 and again on July 18, 1977 the FDA Commissioner forwarded to the Secretary the FDA's analysis of the use and risks of phenformin together with a discussion of options and recommendations.

6. On July 25, 1977 the Secretary issued his order suspending new drug applications for phenformin and ordered an end to general marketing within 90 days (October 23, 1977).

7. On August 29, 1977 plaintiff filed this action seeking injunctive and declaratory relief with respect to the Secretary's Order.

## II

### Preliminary Injunction

The standards which guide the decision to grant a preliminary injunction are well established. To prevail, plaintiffs must show a substantial likelihood of success on the merits and that irreparable harm will flow from the denial of an injunction. In addition, the Court must consider the inconvenience that an injunction would cause the opposing party, and must weigh the public interest. *See Fund for Animals v. Frizzell,* 174 U.S.App.D.C. 130, 134, 530 F.2d 982, 986 (1975); *A Quaker Action Group v. Hickel,* 137 U.S.App.D.C. 176, 181, 421 F.2d 1111, 1116 (1969); *Virginia Petroleum Jobbers Ass'n v. F.P.C.,* 104 U.S.App.D.C. 106, 110, 259 F.2d 921, 925 (1958).

### (A) *Likelihood of Success on the Merits*

In considering the likelihood of success on the merits, it should be noted at the outset that the review by this Court of the Secretary's decision to suspend phenformin pursuant to his authority under 21 U.S.C. § 355(e) is limited to a determination of whether that decision was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law. 5 U.S.C. § 706(2)(A). Thus, in order to satisfy this standard, plaintiffs must demonstrate a substantial likelihood that ultimately they will be able to show the Secretary's decision was arbitrary and capricious. In other words, they must demonstrate the substantial likelihood that the decision was "a clear error of judgment" by the Secretary and that he failed to articulate any rational connection between the facts submitted to him and the choice he made. *See Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974).

To determine whether a rational basis existed for the Secretary's decision, reference must be made to his July 25, 1977 order of suspension (the Order).

In the Order, the Secretary indicated that he considered the following sources in arriving at his decision:

1. The report and supporting documents submitted by the FDA Endocrinology and Metabolism Advisory Committee in October, 1976 in which it unanimously recommend removal of phenformin from the market (Order at 3).

2. Published scientific studies and other materials submitted by the FDA Bureau of Drugs with its May 6, 1977 proposal to withdraw phenformin from the market (Order at 3).

3. Oral and written submissions made at the May 13, 1977 public hearing conducted by the FDA to obtain views concerning the HRG petition to suspend phenformin. (Order at 22).

4. The June 27th and July 18th FDA Commissioner's reports containing an analysis of the use and risks of phenformin, available options and recommendations. (Order at 22, 23).

---

**2.** The formal hearing procedure is continuing. Final orders, which will be appealable, will probably not issue until late 1977.

While acknowledging the existence of "conflicting testimony" on the incidence of lactic acidosis among phenformin patients (Order at 7) and the view expressed by the manufacturers that labeling changes made in January, 1977 would reduce the incidence of phenformin-related lactic acidosis (Order at 46), the Secretary nonetheless deemed that the following factors necessitated his decision to suspend:

1. The discontinued marketing of phenformin in Norway and Canada based on the experience in those countries with phenformin related lactic acidosis cases. (Order at 8, 11, 47).

2. Adverse reports of phenformin-related lactic acidosis in Finland, Sweden, New Zealand, and Australia. (Order at 8).

3. The discontinued use of phenformin by several diabetes clinics in major U.S. hospitals. (Order at 12).

4. The unanimous October, 1976 recommendation by the FDA Endocrinology and Metabolism Advisory Committee that phenformin be removed from the market. (Order at 19).

5. The May 6, 1977 decision by the FDA's Bureau of Drugs to seek withdrawal of approval of NDA's for phenformin. (Order at 20).

6. Calculations submitted by the FDA's Bureau of Drugs based on information it had received from phenformin manufacturers, research conducted in other countries, studies conducted in a group of university based medical centers and reports from individual hospitals. (Order at 38). Those calculations indicated that:

   a. Between 0.25 and four cases of lactic acidosis arose per 1,000 phenformin users per year with an approximate mortality rate of fifty per cent. (Order at 42).

   b. That the estimated incidence of death due to lactic acidosis in phenformin users is between 0.125 and 2 deaths annually per 1,000 patients—a rate 5 to 80 times higher than that of other widely used drugs known to cause fatalities even when properly used. (Order at 42).

   c. That between four and 60 patients would die each month from phenformin—induced lactic acidosis. (Order at 42).

   d. That final administrative action on withdrawal of the NDA's for phenformin could take from six to twelve months during which time anywhere from 10 to 700 people could die from phenformin associated lactic acidosis. (Order at 47).

Plaintiffs do not ask the Court at this juncture to evaluate the relative merits of the conflicting medical views on the hazards posed by phenformin.[3] Rather they assert (1) that the Secretary employed an improper standard in determining that phenformin posed an imminent hazard; and (2) that the long standing availability of the data relied on by the Secretary and the chronology of events preceding his decision demonstrate a lack of the immediacy required to support such a determination; and (3) that the procedural mechanism employed by the Secretary in implementing his decision was arbitrary, capricious, and ultra vires.

In support of their assertion as to lack of imminency, plaintiffs allege that the standards used by the Secretary in determining that phenformin posed an imminent hazard under the statute do not comport either with the standards dictated by Congress[4] or

---

**3.** Plaintiffs' Memorandum in Support of its Motion for a Preliminary Injunction (P.M.) at 12. Plaintiffs do allege however they will ultimately be able to refute the medical conclusions on which the decision was based.

**4.** Plaintiffs cite the Senate Judiciary Report accompanying the 1962 Amendments to the Food, Drug, and Cosmetic Act which added the imminent hazard provision to the effect that

the Secretary's power should be exercised "only in the exceptional case of an emergency, which does not permit the Secretary to correct it by other means." S.Rep.No.1744, Pt. 2, 87th Cong., 2d Sess. P. 7 (1962).

Reference is also made to the consideration of the amendments by the Senate where it was noted that the imminent hazard authority "should only be exercised under the most ex-

with those set forth in the FDA's own regulation.[5]

As recited in the Order, the criteria used by the Secretary to determine the imminence of the hazard included:

1. The severity of the harm that could be caused by the drug during the completion of customary administrative proceedings to withdraw the drug from the general market.

2. The likelihood that the drug will cause such harm to users while the administrative process is being completed.

3. The risk to patients currently taking the drug that might be occasioned by the immediate removal of the drug from the market taking into account the availability of other therapies and the steps necessary for patients to adjust to these other therapies.

4. The likelihood that after the customary administrative process is completed, the drug will be withdrawn from the general marketing.

5. The availability of other approaches to protect the public health. (Order at 34).

Upon reviewing these criteria, the Court is not persuaded either that they improperly reflect the intent of Congress[6] or are at substantial variance with the FDA regulation. And, even if there may exist some discrepancy between the Secretary's criteria and those set forth in 21 CFR § 2.5, we would note that the regulation was de-

signed to guide the FDA Commissioner in making his *recommendations* to the Secretary with respect to the existence of an imminent hazard, and would not necessarily bind the Secretary in making his nondelegable decision to suspend. Further we are not inclined to adopt plaintiff's "crisis" interpretation of imminent hazard. Rather we are more persuaded by defendant's suggested analogy to cases interpreting the imminent hazard provisions of the Federal Insecticide, Fungicide and Rodenticide Act[7] which caution "against any approach to the term imminent hazard . . . that restricts it to a concept of crisis" and adopt the view that "It is enough that there is substantial likelihood that serious harm will be experienced during . . . any realistic projection of the administrative process." *See Environmental Defense Fund v. Environmental Protection Agency,* 167 U.S. App.D.C. 71, 76, 510 F.2d 1292, 1297 (1975) (E.D.F. II); *Environmental Defense Fund v. Environmental Protection Agency,* 150 U.S.App.D.C. 348, 360, 465 F.2d 528, 540 (1972) (E.D.F. I).

We decide accordingly that the Secretary's criteria for evaluating the existence of an imminent hazard were not improper. There remains to be determined whether a rational connection exists between the facts on which he relied and his decision to suspend. Keeping in mind that "invocation of this emergency power is a matter which is peculiarly one of judg-

---

treme conditions and with the utmost care." 108 Cong.Rec. 16304 (Aug. 23, 1962).

5. The FDA regulation defines imminent hazard as one, "(1) that should be corrected immediately to prevent injury and (2) that should not be permitted to continue while a hearing or other formal proceeding is being held. The 'imminent hazard' may be declared at any point in the chain of events which may ultimately result in harm to the public health. The occurrence of the final anticipated injury is not essential to establish that an 'imminent hazard' of such occurrence exists." 21 CFR § 2.5(a).

The regulation also noted that in determining the existence of an imminent hazard, the number, nature, severity and duration of the injury will be considered. 21 CFR 2.5(b).

6. The Secretary's interpretation of Congressional intent with respect to the imposition of a suspension order was as follows:

(1) ". . . the evidence before the Secretary shows that a drug is so unsafe as to create a public health situation which must be corrected immediately and cannot be permitted to continue while a hearing is being held;

(2) that this procedure be used only when the public health situation to be corrected is serious; and

(3) that the Secretary's action reflect the nature of the hazard, and the extent of the proceedings that have occurred prior to his action." (Order at 30).

7. 7 U.S.C. § 136d(c).

ment," [8] this Court cannot say that the facts on which the Secretary relied, particularly the calculations provided by the Bureau of Drugs, do not adequately support his decision to suspend.[9]

We also disagree with plaintiffs' second assertion that the chronology of events leading up to the Secretary's decision and the alleged long standing availability of data on which he relied serve to demonstrate a lack of imminency and result in an arbitrary decision based on non-supportive data. The chronology of events submitted by plaintiffs at best demonstrate the existence of sharply differing views concerning the risks and benefits of phenformin. The mere fact that respectable scientific authority can be found on both sides of this question does not render the Secretary's decision arbitrary and capricious. *See* E.D.F. I, *supra*, 150 U.S.App. D.C. at 357, 465 F.2d at 537; E.D.F. II, *supra*, 167 U.S.App.D.C. at 82, 510 F.2d at 1298. Similarly, the fact that much of the raw data used by the Bureau in arriving at its conclusion had been available for some length of time does not preclude its use in finding an imminent hazard when, as the FDA alleged happened in this case,[10] the magnitude of phenformin's risk was determined only after an extensive re-evaluation of the data following the May 13th hearing. *Cf. Bell v. Goddard*, 366 F.2d 177, 181 (7th Cir. 1966).

In view of the facts used by the Secretary to support his decision we are also not persuaded by plaintiffs' arguments that his decision was arbitrary because allegedly less drastic means such as the use of accepted labeling procedures might eventually result in reducing phenformin's hazards or that the decision was arbitrary because other drugs currently available might be equally as hazardous.

Assuming, as we must at this juncture, the validity of the Bureau of Drug's projection of between four and 60 phenformin related deaths each month, we cannot find that the Secretary's conclusion that labeling changes "cannot be expected to achieve a needed reduction in the usage of phenformin within any reasonable time frame . . . with so many lives at stake," [11] was either arbitrary or unreasonable. Nor was it made so by his decision to act first on phenformin rather than some other drug which may pose a hazard of similar magnitude. *See* E.D.F. II, 167 U.S. App.D.C. at 78, 510 F.2d at 1303.

Having considered all of plaintiffs' assertions of arbitrary and capricious conduct by the Secretary in arriving at his decision, we are not convinced that they have met their burden of showing a substantial likelihood of being able to demonstrate that he failed to articulate any rational connection between the facts submitted to him and the choice he made.

### B. *Irreparable Injury*

Turning now to the issue of irreparable injury, plaintiffs' allegations in this regard seem to fall in three categories:

1. The injury that will occur to the integrity of the administrative process if the Secretary's procedure of arriving at his decision and implementing it is allowed to stand.

2. The injury that will occur to plaintiffs due process rights.

3. The injury that will result from physicians inability to prescribe and diabetic patients inability to receive phenformin.

The first injury to which reference is made is premised on the assumption that

---

**8.** *American Public Health Association v. Veneman*, 349 F.Supp. 1311, 1316 (D.D.C.1972).

**9.** As previously noted, plaintiffs allege that eventually they will be able to demonstrate a complete lack of foundation for the Bureau's conclusions. If this is shown, arguably a decision to suspend NDA's for phenformin based on such data would be arbitrary and capricious.

**10.** See Memorandum of June 27, 1977 from Marion Finkel, M.D. Associate Director for New Drug Evaluation to J. Richard Crout, Director, Bureau of Drugs at 24 (Appendix J to plaintiffs' memorandum.)

**11.** (Order at 58).

the process used by the Secretary in arriving at his decision and his method of implementation were improper. As previously discussed, we have not found fault with the process used to arrive at the decision. However, plaintiffs also object to what it alleges is the unprecedented and unlawful attempt by the Secretary to create within the suspension order a voluntary system of limited distribution to those small number of patients for whom it may be determined that phenformin's benefits outweigh its risks. Plaintiffs voice similar objections to the Secretary's 90 day delay in implementing his order. In view of the fact that the Secretary's power to suspend under Section 355(e) has never been exercised, it is obvious that any method of implementation used would be unprecedented. Although there is no legislative history on the subject to guide us, we cannot believe that Congress intended to limit the power to suspend in such a way that it could only be exercised in an immediate and unequivocal manner. It appears to us that the Secretary's dual concerns of an orderly withdrawal of the use of the drug from the majority of patients now using it, and of accommodating the small number of patients for whom the benefits outweighed the risks were eminently reasonable and that the power to deal with them in the manner in which he did could fairly be implied from his power to suspend.[12]

Our holding that the facts available to the Secretary at the time of his decision were sufficient to justify it also serves to dispose of plaintiffs' alleged injury to their due process rights. Given the non-arbitrary basis for the decision, the statute clearly allows suspension prior to any hearing.[13]

Plaintiffs' third alleged irreparable injury, that of the potential harm and inconvenience to which doctors, and more particularly their patients will be subjected as a result of their inability to obtain phenformin causes us the greatest concern. However, in weighing the potential harm to which plaintiffs may be subjected against the potential loss of life that may occur if the drug is not suspended we must conclude that the irreparability of the harm alleged by the Secretary and those he seeks to protect necessitate our finding in his favor.

Having found against plaintiffs on their substantial probability of succeeding on the merits and on the issue of irreparable harm, the Court concludes that it must deny plaintiffs' Motion for a Preliminary Injunction.[14]

### III

### *Summary Judgment*

In ruling on defendant's Motion for Summary Judgment, the Court's function is to determine whether a genuine issue of fact exists, not to resolve any existing factual issues.[15] The movants have the burden of showing the absence of any genuine issue as to all material facts.[16]

Upon consideration of all papers filed by the parties with respect to this motion the Court is of the view that material issues of fact still exist. Therefore defendant's Motion for Summary Judgment should be and the same hereby is denied.

### IV

### ORDER

An order reflecting the foregoing conclusions was duly filed on October 21, 1977.

---

**12.** It should be noted the statute reads that the Secretary "*may* suspend the approval of such application immediately" not that he *must* do so. *See* 21 U.S.C. § 355(e). (Emphasis supplied).

**13.** It should also be noted that four of the thirteen plaintiffs testified at the May 13, 1977 pre-suspension hearing and three others filed written comments which were incorporated into the record. *See* Testimony, Public Hearing on the Issue of Whether to Invoke the "Imminent Hazard" Clause of Section 505(e) of the

F.F.D.C.A. to Remove Phenformin Hydrochloride from the Market, May 13, 1977 at 16, 65, 82, 124 (P.M. Appendix F).

**14.** Parts I and II hereof constitute the Findings of Fact and Conclusions of Law required by Rule 52(a) Fed.R.Civ.P.

**15.** See 6 J. Moore, Federal Practice ¶ 56.15[1–0] at 56–391 (2 ed. 1976).

**16.** *Id.* at 56–463.