The DOW CHEMICAL COMPANY et al., Plaintiffs,

v.

Barbara BLUM et al., Defendants.

Civ. A. No. 79–10064.

United States District Court,
E. D. Michigan, N. D.

April 12, 1979.

894

Herbert H. Edwards, James N. O'Connor, Michael J. Traynor, Dow Chemical Company, Midland, Mich., Rudolf H. Schroeter,

LaFollette, Johnson, Schroeter & Dettaas, Los Angeles, Cal., for Dow Chemical Co.

Allen A. Lauterbach, Gen. Counsel, Park Ridge, Ill., C. David Mayfield, John J. Rademacher, Asst. Legal Counsels, Park Ridge, Ill., for American Farm Bureau Federation.

Anthony P. Brown, Pillsbury, Madison & Sutro, San Francisco, Cal., for Western Timber Association, Chevron Chemical, National Aborists Association, Asplundh Tree Expert Co.

Allen T. Malone, Apperson, Crump, Duzane & Maxwell, Memphis, Tenn., for Vertac, Inc., National Railroad Contractors Assoc., National Agriculture Aviation Assoc., Bartlett Tree Co., The Davey Tree Expert Co.

Ronald A. Zumbrun, Raymond M. Momboisse, Eileen B. White, Pacific Legal Foundation, Washington, D. C., for Southern Oregon Resources Alliance, Oregon Women For Timber.

Manley B. Strayer, Phillip D. Chadsey, Davies, Biggs, Strayer, Stoel & Boley, Portland, Or., for Industrial Forestry Association.

Richard Dec. Hinds, Cleary, Gottlieb, Steen & Hamilton, Washington, D. C., for United States Steel Corp.

J. Evan Goulding, Friedman, Hill & Robbins, Denver, Colo., O. Russell Armstrong, Davis & McLeod, Washington, D. C., for National Cattlemen's Association.

Robert C. Klevorn, Boyne City, Mich., for Northern Michigan Electric Cooperative, Michigan Electric Cooperative Association.

Joseph E. Stevens, Jr., Lathrop, Koontz, Righter, Clagett, Parker & Norquist, Kansas City, Mo., for the Andersons.

James H. Eddleman, Springfield, Ill., for Association of Illinois Electric Cooperatives.

Eugene N. Buchheit, Louisville, Ky., for Kentucky Association of Electric Cooperatives, Inc.

Michael S. Winer, Ellen Siegler, U. S. Environmental Protection Agency, Washington, D. C., for Barbara Blum.

Donald W. Stever, Jr., U. S. Dept. of Justice, Land & Natural Resources Div., Washington, D. C., for Douglas Costle.

Joan M. Cloonan, U. S. Dept. of Justice, Pollution Control Section, Washington, D. C., for John McGuire, Environmental Protection Agency.

Edward W. Warren, Kirkland & Ellis, Washington, D. C., for plaintiffs.

## MEMORANDUM OPINION AND ORDER

### JAMES HARVEY, District Judge.

On March 6, 1979, plaintiffs brought this action seeking judicial review of a decision by the Environmental Protection Agency (EPA) to order an emergency ban of two herbicides manufactured primarily by the plaintiff Dow Chemical Company (Dow). The herbicides are commonly known as 2,4,-5–T and Silvex. In ordering the ban, EPA was acting, for the first time, pursuant to its emergency powers under Section 6(c)(3) of the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA), 7 U.S.C. § 136d(c)(3). Such action is subject to immediate review in the district courts solely to determine whether the order of suspension was arbitrary, capricious, or otherwise not in accordance with the law. 7 U.S.C. § 136d(c)(4).

The twenty-one plaintiffs joined in this action are registrants and/or users of 2,4,-5–T or Silvex. The plaintiff Dow Chemical Company is the primary manufacturer of 2,4,5–T, and is the plaintiff primarily responsible for litigating the plaintiffs' case. The defendants consist of Ms. Barbara Blum, Deputy Administrator of EPA; Mr. Douglas Costle, Administrator of EPA; Mr. John McGuire, Regional Administrator of Region V of EPA; and the EPA itself.

Plaintiffs filed this action, as well as motions for an immediate stay of the EPA emergency suspension orders and for accelerated discovery, on March 6, 1979. On March 7, 1979, defendants filed a motion for a protective order seeking to limit the requested discovery. The same day, March 7, 1979, the Court denied the request for an immediate stay and tentatively set the mat-ter on for a hearing for April 3, 1979. In addition, the Court allowed each party ten days to respond to the discovery motions in question. On March 19, 1979 the Court ruled on the respective discovery motions, granting the motion for accelerated discovery and granting in part the motion for a protective order. In this connection, the Court allowed the plaintiffs to discover all requested documents and to take the depositions of lower EPA officials and contractors for the sole purpose of determining the contents of the administrative record.

Subsequently, on March 16, 1979, EPA filed a motion in limine seeking to cancel the scheduled hearing and limit review to the administrative record as compiled by EPA. On March 27, 1979, the Court denied this motion and permitted the plaintiffs to introduce at the scheduled hearing evidence and direct oral testimony addressing the question whether the emergency suspension orders issued by EPA on February 28, 1979, were arbitrary, capricious, an abuse of discretion or were issued in accordance with the procedures established by law. Later, the Court reset the scheduled hearing for April 5, 1979.

The matter is before the Court on plaintiff's motion to stay the EPA emergency suspension orders reflected above. The Court heard testimony on the matter April 5, 6, 7 and 8 of 1979. In addition, the Court has received numerous exhibits consisting largely of affidavits and depositions, as well as the administrative record certified to this Court by EPA. Having reviewed the testimony and exhibits, the relevant portions of the administrative record cited to the Court by the parties, as well as the law on the matter, the Court believes that the request for a stay of the EPA emergency suspension orders of February 28, 1979 should be denied. Because of the need for an expedited decision, the ensuing discussion will be relatively brief.

### FACTUAL BACKGROUND

On February 28, 1979, EPA issued two emergency suspension orders which had the effect of immediately suspending the distri-

bution, sale, and use of: (1), 2,4,5–T for forestry, rights-of-way, and pasture uses; and (2) Silvex for the foregoing uses, as well as home and garden, aquatic weed control/ditch bank, and commercial/ornamental turf uses. The emergency suspension orders were based on a judgment by EPA that pregnant women at the time of exposure to the banned uses of 2,4,5–T and Silvex faced an immediate unreasonable risk of spontaneous abortions. The suspension orders themselves reflect that this judgment was based on essentially two categories of information: (1) laboratory tests which indicated that the contaminant TCDD, which is present in small amounts in both 2,4,5–T and Silvex, produced feto-toxic and teratogenic effects in animals at extremely low dose levels; and (2) an epidemiological study, labeled "Alsea II," which claimed to have found a statistically significant correlation between the spraying of 2,4,5–T and the occurrence of spontaneous human abortions in women residing in the Alsea basin region on the western coast of Oregon. As the suspension orders frankly state, however, it was the Alsea II Study, completed and reviewed by EPA near the end of February, 1979, which provided "the new point of departure" and the claimed additional evidence which necessitated the emergency action by EPA.

The events leading to the Alsea II Study are as follows:

(1) In 1970, the United States Department of Agriculture (USDA) suspended the registration of 2,4,5–T for aquatic and home uses;

(2) In July, 1973, EPA initiated cancellation proceedings on all registered uses of 2,4,5–T with hearings to commence in April of 1974; the cancellation notices were later withdrawn in June, 1974;

(3) In April, 1978, as part of its ongoing program to review the safety of pesticides presently in use, EPA initiated Rebuttable Presumption Against Registration (RPAR) proceedings for 2,4,5–T; the purpose of these proceedings was to carry out a thorough, in-depth scientific review of the long-range risks and benefits of continued use of 2,4,5–T;

(4) In the summer of 1978, during the RPAR proceedings, EPA received complaints from nine women in the Alsea, Oregon area claiming they had experienced miscarriages because of the herbicide spraying in the course of forest management; in July of 1978, as a result of these complaints, the Human Effects Monitoring Branch (HEMB) of EPA initiated an investigation, labeled "Alsea I" and separate from the RPAR proceedings, of the possible relationship between 2,4,5–T spraying and the abortions experienced by these nine women;

(5) The Alsea I investigation consisted of administering a questionnaire to each of the nine women, and referring the results and other information to ten persons, mostly obstetricians and gynecologists, for review; all the reviewers concluded that a causal relationship between forest herbicide spraying and reproductive wastage had not been demonstrated from the data presented;

(6) In October, 1978, deciding that the results of Alsea I required a broader-based epidemiological study of the possible relationship between the spraying of 2,4,5–T and the occurrence of spontaneous abortions in the Alsea Region, EPA contacted Colorado State University for the purpose of initiating the Alsea II investigation which lies at the heart of this action;

(7) In late January or early February of 1979, the Colorado State researches transmitted the final Alsea II report to HEMB;

(8) On February 28, 1979, EPA issued the two emergency suspension orders involved in this action based partly on the results of the Alsea II investigation.

The Alsea II investigation was designed to test the rates of spontaneous abortions occurring in a forested region (Study Area) of Oregon's coastal range, centered about the Alsea Basin (which is roughly equidistant from Oregon's northern and southern borders and where 2,4,5–T has been commonly used in forest management) and to

compare those rates with rates occurring in a comparable control area lying on Oregon's eastern border (Control Area). Specifically, the study was designed to test the following hypotheses:

(1) Whether or not differences in spontaneous abortion rates exist between the study and control populations;

(2) Whether or not seasonal variations in rates exist between the study and control populations; and

(3) Whether or not such variations, if they exist, can be associated with time and concentration of spray applications in the Study Area.

To test these hypotheses, the Colorado State researches collected data from in-patient records from seven major hospitals located in or near the study and control areas of women hospitalized for spontaneous abortions of less than twenty-weeks term. The data were collected for a six-year period from 1972 to 1977. In addition, data were collected on the number of births in these areas. These data were then used to compute a spontaneous abortion index, defined basically as the ratio of the number of hospitalized spontaneous abortions from women residing in an area to the number of live births occurring in that area. Index values were calculated, by month and area, for the aggregated six-year data and for the two three-year periods 1972–1974 and 1975–1977. The areas under consideration included not only the study and control areas as reflected above, but also an urban area adjacent to the Study Area in which the spraying of 2,4,5–T did not occur and which was used to make supplemental comparisons.

In addition to the collection of data relative to spontaneous abortions, spray data on the use of 2,4,5–T were collected and plotted for the immediate area referred to as the "Alsea Basin", an area existing within the Study Area. Testimony introduced at the hearing revealed, however, that spraying of 2,4,5–T was done throughout the Study Area. The spray data reflected that peak spraying in the Alsea Basin occurred in March, April, and May with a secondary peak occurring in July and August. Approximately 75% of the total amount of 2,4,5–T sprayed during the six-year period under investigation occurred during the final three years of that period.

The collected data were then subjected to a series of highly technical statistical analyses. The ultimate conclusions reached by the researchers were as follows:

(1) The 1972–1977 abortion rate index for the Study Area is significantly higher than those for either the control or urban area;

(2) There is a statistically significant seasonal cycle in the abortion index in each of the areas with a period of about four months; in particular, there is an outstanding peak in June in the Study Area;

(3) There is a statistically significant cross-correlation between the Study Area spontaneous abortion index and spray patterns in terms of pounds applied by months in the Alsea Basin, for the 1972–1977 period, after a lag time of two or three months.

The Alsea II Report also stated that these conclusions were "confirmed and enhanced" by the analysis of the two three-year aggregates. In this connection, however, the Alsea II Report added the important caveat: "For all its complexity . . . this analysis is a correlational analysis, and correlation does not necessarily mean causation."

In addition to relying on the Alsea II Report in issuing the emergency suspension orders, EPA considered, as reflected above, laboratory studies on the effect of TCDD on animals. At present, 2,4,5–T and Silvex cannot be manufactured without producing as a by-product the contaminant TCDD. The studies relied upon by EPA reflect that TCDD is a highly feto-toxic and embryo-lethal substance for which a no-effect level has not, at present, been determined. The more significant studies relied upon include: (1) A study conducted by Schantz, et al. where feto-toxic effects were observed in monkeys at a dose level of .002 micrograms TCDD/kg per day; (2) A recently completed study conducted by Dow on rats where exposure to .001 micrograms TCDD/kg per

day, the lowest level tested therein, resulted in statistically significant increases in the percentage of pups dead at birth and/or dying before the end of three weeks of life in some generations.

EPA also considered the prospective benefits from the continued use of 2,4,5–T and Silvex during the three and one-half month period that the emergency suspension order would be in effect. Due to the relatively short period that the emergency suspension orders would be in effect, as well as the availability of alternative herbicides, EPA concluded that the benefits of continued use of 2,4,5–T and Silvex during the suspension process would be nominal.

After considering the risks to human health and the environment posed by 2,4,-5–T and Silvex, the prospective benefits of continued use of 2,4,5–T and Silvex during the suspension process, as well as the imminency of the March spraying period for 2,4,5–T, EPA concluded that emergency action was necessary. In this regard, EPA concluded that, although the Alsea II Study was confined solely to data relating to 2,4,-5–T, the chemical similarity between 2,4,-5–T and Silvex, and the probable use of Silvex as an alternative to 2,4,5–T, required that emergency action be taken with regard to Silvex as well.

Six days after the emergency suspension orders were issued, plaintiffs filed this action seeking judicial review and a stay of the orders.

## ISSUE

The ultimate issue to be decided by the Court in this matter is a simple one: whether the EPA decision that an emergency existed with respect to the uses in question of 2,4,5–T and Silvex, which did not permit a hearing prior to suspension was arbitrary, capricious, or an abuse of discretion or otherwise not made in accordance with the procedures established by law. This ultimate issue leads to a secondary legal issue: what is the meaning of the term "emergency".

## APPLICABLE LAW

### A. STATUTORY FRAMEWORK

As EPA correctly points out in its brief, FIFRA generally requires that all pesticides be registered with the Administrator after a determination that the pesticide meets registration requirements, set forth in Section 3(c)(5) of FIFRA, 7 U.S.C. § 136a(c)(5), which requires a determination that the pesticide to be registered will not cause "unreasonable adverse effects on the environment." Section 6 of FIFRA, 7 U.S.C. § 136d requires the Administrator to exercise a continuous review of pesticides that have been registered. This provision recognizes that information may arise subsequent to registration that indicates that a pesticide which had been considered in compliance with the statutory standards may pose a significant hazard to human health or the environment.

If it appears to the Administrator that a pesticide no longer meets registration requirements and appears to cause unreasonable adverse effects on the environment, the Administrator may choose among three types of regulatory responses: The Administrator may: (1) cancel a registration; (2) suspend a registration pending cancellation ("ordinary suspension"); or (3) suspend a registration pending suspension ("emergency suspension").

This case involves the third type of action: issuance of an emergency suspension order with respect to 2,4,5–T and Silvex, pending a suspension proceeding.

The ordinary suspension provision (Section 6(c)(1) of FIFRA (7 U.S.C. § 136d(c)(1)) provides that the Administrator may, by order, suspend the registration of a pesticide if he "determines that action is necessary to prevent an imminent hazard during the time required for cancellation . ." The term "imminent hazard" is defined to mean "a situation which exists when the continued use of a pesticide during the time required for cancellation proceeding would be *likely* to result in unreasonable adverse effects on the environment . . ." (emphasis added) 7 U.S.C. § 136(1). The

term "unreasonable adverse effects on the environment" is defined to mean "unreasonable risk to man or the environment taking into account the economic, social, and environmental costs and benefits." FIFRA § 2(bb) (7 U.S.C. § 136(bb)). A finding of imminent hazard, therefore, results from a finding that the risks of use of the pesticide appear likely to exceed the benefits during the cancellation proceedings.

An ordinary suspension action is not effective immediately, but becomes effective after notice of intent to suspend and a hearing has been given to the registrant, provided a hearing is requested. If no hearing is requested, a suspension order may be issued and takes effect. Such order is then not reviewable by a court. 7 U.S.C. § 136d(c)(2).

The emergency suspension provision, Section 6(c)(3) of FIFRA, 7 U.S.C. § 136d(c)(3) provides that the Administrator may, by order, suspend the registration of a pesticide immediately upon issuance of an emergency suspension order—prior to a hearing and prior to notifying the registrant—whenever he determines that an emergency exists which does not permit the Administrator to hold a hearing prior to suspension. An emergency suspension order remains in effect until the cancellation decision unless an expedited hearing is requested. If an expedited hearing is requested on the issue of imminent hazard, the emergency order continues in effect until the issuance of a·final suspension order.

In this connection, the plaintiffs have requested a suspension hearing· and estimate that, unless stayed, the emergency suspension order will continue in effect for three and one-half to four months while the suspension process takes place. Following the suspension hearing, the Administrator may affirm, modify or vacate the emergency suspension order, and his decision is then reviewable in the Courts of Appeal.

The key statutory provision involved in this action provides for judicial review of such emergency suspension orders, as follows:

"Any order of suspension entered prior to a hearing before the Administrator shall be subject to immediate review in an action by the registrant or other interested person with the concurrence of the registrant in an appropriate district court, solely to determine whether the order of suspension was arbitrary, capricious or an abuse of discretion, or whether the order was issued in accordance with the procedures established by law."

Section 6(c)(4) of FIFRA, 7 U.S.C. § 136d(c)(4).

This is the first time an emergency suspension order has been before a court on judicial review. In construing and applying the applicable standard of review, this Court is therefore necessarily required to consider the relevant legislative history, as well as the decisions in the analogous area of judicial review of EPA suspension orders issued *after* the completion of a suspension hearing.

## B.   LEGISLATIVE HISTORY

### 1.   FIFRA in General

The applicable legislative history reflects that FIFRA was enacted for three basic reasons:

(a) To impose restrictions on the use of pesticides; prior law imposed labeling requirements, but did not restrict the actual use, of pesticides;

(b) Extend Federal pesticide regulation to *intra* state, by contrast to, interstate commerce; and

(c) Strengthen and streamline pesticide regulation.

Senate Report 92–838 (Committee on Agriculture and Forestry), 1972 United States Code Congressional and Administrative News at 3993, 3996–98.

This third reason outlined above, the strengthening and streamlining of pesticide regulation, is relevant in this case. In this connection, Congress made it clear that FIFRA was designed to avoid the lengthy delays experienced under prior law in removing potentially dangerous pesticides from the market.

"Recent experience under FIFRA amply illustrates the delays that EPA has encountered in removing a pesticide from the market. On June 2, 1972, Administrator Ruckelshaus signed an order which will remove DDT from the market for most uses. The original notice of intent to cancel was issued on January 15, 1971. Thus fifteen months were consumed by advisory committee referral, public hearings and decision-making by EPA. Other examples include: Amitrol, 2½ years; mercury algicide, fourteen months; and Mirex, thirteen months. The initial notice of cancellation of certain uses of the herbicide 2,4,5–T was issued on May 1, 1970. Today, only advisory committee action is completed, with public hearings and final decision yet to come. While a proper review of any intention to cancel a registration is an obvious necessity, delays of the sort encountered under current law are needless."

Senate Report 92–970 (Senate Commerce Committee), 1972 United States Code Congressional and Administrative News at 4094. In this regard, President Nixon remarked in his environmental message of February 8, 1971:

"Currently, Federal controls over pesticides consist of the registration and labeling requirements of the Federal Insecticide, Fungicide and Rodenticide Act. The administrative processes contained in the law are inordinately cumbersome and time consuming . . ."

1972 United States Code Congressional and Administrative News at 4093. During the Senate floor debate of FIFRA, Senator Allen explained further:

"As recent experience has shown, any administrative actions that are undertaken under this law to remove a pesticide from the market are not only exceedingly complex and lengthy, they are also undertaken after distributions in the market and use in the environment.

Instead of continuing to wait for tragic evidence of pesticide dependence and misuse to force itself upon our consciences, we must institute the legal scientific and administrative framework to search for hard information and knowledge about pesticides and pest control before these toxic substances become widely used. Passage of H.R. 10729 will indicate that we are finally prepared to impose sensible rules and guidelines for the marketing and use of pesticides . . .

Now we are considering and debating another major piece of pesticide legislation. H.R. 10729 seeks to modernize the Federal Insecticide, Fungicide, and Rodenticide Act and give the Environmental Protection Agency the proper administrative tools to both regulate the entry of new pesticides into the market and oversee the actual use and application of these pesticides once they have been registered with EPA . . .

As a cosponsor with Senator Hart of a majority of these amendments it is my opinion that these provisions give important additional authority to the Environmental Protection Agency to protect the environment and the public from the misuse of unnecessary or dangerous pesticides."

118 Congressional Record 32259–60 (September 26, 1972).

Thus, in examining the EPA decision in this case, the Court must keep in mind that it was the Congressional intent that potentially dangerous pesticides should be removed from the market without delay and that EPA be given expanded authority to regulate pesticides.

2. *Purpose For a Hearing*

It is clear that the crux of this lawsuit is the propriety of the banning of 2,4,5–T and Silvex without a hearing. To answer this question, it is useful to inquire as to the purpose for a hearing. The legislative history indicates, in this connection, that a hearing serves an information-gathering function to allow the Administrator to make reasoned decisions in regulating pesticides:

"The purpose of the hearings is to provide a record of competent scientific evidence for the consideration of the Administra-

tor in making his decision as to whether or not a registration should be granted or denied."

Senate Report 92–838 (Committee on Agriculture and Forestry), 1972 United States Code Congressional and Administrative News at 4008.

In this regard, the Senate Commerce Committee has remarked concerning the grant of emergency authority at issue in this case:

"The amendment gives EPA the authority, if necessary to prevent an imminent hazard, to suspend without a hearing or after an expedited hearing *if more information needs to be gathered.*" (emphasis added)

Senate Report 92–970 (Commerce Committee), 1972 United States Code Congressional and Administrative News at 4112. Thus, in considering the propriety of EPA emergency action, the Court should consider the purposes behind a suspension hearing and whether, in the particular case, they are outweighed by the need for summary action.

It is noteworthy in this regard that the Administrator is not bound under FIFRA to follow the decision of the Administrative Law Judge (ALJ) made after a hearing. Indeed in a recent case, the Administrator deviated from the decision of the ALJ where a suspension order was issued after a hearing. *Environmental Defense Fund v. EPA,* 179 U.S.App.D.C. 43, 48, 548 F.2d 998, 1003 (1976), cert. den. 431 U.S. 925, 97 S.Ct. 2199, 53 L.Ed.2d 239 (1977). This illustrates the fact that a suspension hearing performs only an information-gathering function.

### C. *MEANING OF THE TERM "EMERGENCY"*

■■■ The term "emergency" is not defined in the Act, legislative history, regulations, or the cases. EPA has interpreted the term to mean a threat of harm to humans and the environment so immediate that the continuation of pesticide use is likely to result in unreasonable adverse effects during a suspension hearing. EPA Decision and Emergency Order (2,4,5–T) at 7 (February 28, 1979).

This interpretation is substantially valid and should be analogized to the granting by a court of a temporary restraining order. The statutory scheme of FIFRA parallels the scheme for the granting of temporary and permanent injunctive relief in a court action. As reflected above, FIFRA provides for three possible stages to ban the use of a particular pesticide:

(1) Cancellation proceedings—which could result in a total and permanent ban of a pesticide;

(2) Suspension proceedings—which could result in a temporary ban of a pesticide while cancellation proceedings are taking place; and

(3) Emergency action—which results in a temporary ban of a pesticide while suspension proceedings are taking place.

These stages are obviously similar to the three stages of obtaining relief in a court action—that is, Temporary Restraining Order, Preliminary Injunction, Permanent Injunction.

Because there is no precedent for the Court to follow in this action, it is appropriate to define the term "emergency" by reference to the principles and rationale for the granting by a court of a temporary restraining order. The purpose of a temporary restraining order is to prevent immediate and irreparable harm to the complaining party during the period necessary to conduct a hearing on a preliminary injunction. See generally, Wright and Miller, *Federal Practice and Procedure,* Section 2951. The definition of the term "emergency" by the EPA reflects this same basic rationale—to prevent unreasonable adverse effects on the environment during the time necessary to conduct a suspension hearing. The Court notes, in this connection, that substantial deference has been granted to an Agency's interpretation of the legislation it administers, particularly where the agency has participated significantly in the legislative process fashioning legislation designed to protect the public health. *Certified Color Manufacturers Assoc. v. Mathews,* 177 U.S.App.D.C. 137, 543 F.2d 284

(1976); see also *United States v. Bacto-Unidisk,* 394 U.S. 784, 89 S.Ct. 1410, 22 L.Ed.2d 726 (1968); *Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).

In light of recent cases in the analogous area of review of suspension orders issued after a hearing, however, the EPA definition requires refinement. The Courts hold the standard of review in this instance is whether there is a substantial likelihood that serious harm will be experienced during the year or two required in any realistic projection of the administrative process. *Environmental Defense Fund v. EPA,* 179 U.S.App.D.C. 43, 50, 548 F.2d 998, 1005 (1976), *cert. den.* 431 U.S. 925, 97 S.Ct. 2199, 53 L.Ed.2d 239 (1977); *Environmental Defense Fund v. EPA,* 167 U.S.App.D.C. 71, 510 F.2d 1292 (1975). By analogy to this standard, the term "emergency" should be defined as follows: whether there is a substantial likelihood that serious harm will be experienced during the three or four months required in any realistic projection of the administrative suspension process. This test, coupled with the purposes behind the hearing requirement, suggests the necessity to examine five factors:

(1) The seriousness of the threatened harm;

(2) The immediacy of the threatened harm;

(3) The probability that the threatened harm would result;

(4) Benefits to the public of the continued use of the pesticides in question during the suspension process; and

(5) The nature and extent of the information before the Administrator at the time he made his decision.

Compare *Ethyl Corp. v. EPA,* 176 U.S.App. D.C. 373, 390–391, 541 F.2d 1, 18–19 & n. 32 (1976), *cert. den.* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976). Further, in accordance with the legislative history outlined above, these factors should be applied in the spirit of avoiding delay and recognition of broad powers on the part of EPA in regulating pesticides. *Id.,* 176 U.S.App.D.C. at 396, 541 F.2d at 24.

## D. ARBITRARY AND CAPRICIOUS STANDARD OF JUDICIAL REVIEW DEFINED

Under the arbitrary and capricious standard, the courts uniformly hold that the reviewing court must determine whether the agency considered all the relevant factors and whether it had made a clear error of judgment. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 414, 91 S.Ct. 814, 823, 28 L.Ed.2d 136, 153 (1971). In this regard, the inquiry into the facts is to be searching and careful. *Citizens to Preserve Overton Park v. Volpe, supra,* 401 U.S. at 414, 91 S.Ct. at 823, 28 L.Ed.2d at 153.

The duty to make substantial inquiry is particularly true in highly technical cases such as this one. *Ethyl Corp. v. EPA, supra,* 176 U.S.App.D.C. at 407, 541 F.2d at 35.

The ultimate standard of review, however, is a narrow one—the Court is not empowered to substitute its judgment for that of the agency:

"There is no inconsistency between the deferential standard of review and the requirement that the reviewing court involve itself in even the most complex evidentiary matters; rather, the two indicia of arbitrary and capricious review stand in careful balance. The close scrutiny of the evidence is intended to educate the court. It must understand enough about the problem confronting the agency to comprehend the meaning of the evidence relied upon and the evidence discarded; the questions addressed by the agency and those bypassed; the choices open to the agency and those made. The more technical the case, the more intensive must be the court's effort to understand the evidence, for without an appropriate understanding of the case before it, the court cannot properly perform its appellate function. But that function must be performed with conscientious awareness of its limited nature. The enforced education into the intricacies of the problem before the agency is not designed to enable the court to become a superagency that can supplant the agency's expert decision-maker. To the con-

trary, the court must give due deference to the agency's ability to rely on its own developed expertise . . .

Thus, after our careful study of the record, we must take a step back from the agency decision. We must look at the decision not as the chemist, biologist or statistician that we are qualified neither by training nor experience to be, but as a reviewing court exercising our narrowly defined duty of holding agencies to certain minimal standards of rationality." (footnotes omitted)

*Ethyl Corp. v. EPA, supra,* 176 U.S.App. D.C. at 408, 541 F.2d at 36. See also, *Certified Color Manufacturers Assoc. v. Mathews, supra,* 177 U.S.App.D.C. 137, 146–147, 543 F.2d at 293–94.

In this connection, the arbitrary and capricious standard should be applied flexibly where the agency is dealing with a question peculiarly one of judgment and particularly prone to uncertainty. Both these factors are present where an agency invokes emergency powers with regard to questions involving environmental protection. *Ethyl Corp. v. EPA, supra,* 176 U.S.App.D.C. at 396, 541 F.2d at 24; *Forsham v. Califano,* 442 F.Supp. 203, 208–209 (D.D.C.1977).

"Questions involving the environment are particularly prone to uncertainty. Technological man has altered his world in ways never before experienced or anticipated. The health effects of such alterations are often unknown, sometimes unknowable. While a concerned Congress has passed legislation providing for protection of the public health against gross environmental modifications, the regulators entrusted with the enforcement of such laws have not thereby been endowed with a prescience that removes all doubt from their decision-making. Rather, speculation, conflicts in evidence, and theoretical extrapolation typify their every action. How else can they act, given a mandate to protect the public health but only a slight or nonexistent data base upon which to draw? Never before have massive quantities of asbestiform tailings been spewed into the water we drink. Never before have our industrial workers been occupationally exposed to vinyl chloride or to asbestos dust. Never before has the food we eat been permeated with DDT or the pesticides aldrin and dieldrin. And never before have hundreds of thousands of tons of lead emissions been disgorged annually into the air we breathe . . . [T]he statutes—and common sense—demand regulatory action to prevent harm, even if the regulator is less than certain that harm is otherwise inevitable.

*Ethyl Corp. v. EPA, supra,* 176 U.S.App. D.C. at 396–397, 541 F.2d at 24–25.

Notwithstanding the substantial latitude to which EPA is entitled on judicial review of its emergency suspension orders, clearly there are limits on the exercise of its emergency powers. As reflected above, EPA's conclusions must be held to minimal standards of rationality. *Id.* 176 U.S.App.D.C. at 408, 541 F.2d at 36. Such standards are met where the decision is based on the inconclusive but suggestive results of numerous studies. *Certified Color Manufacturers Assoc. v. Mathews, supra,* 177 U.S. App.D.C. at 138, 543 F.2d at 295; *Ethyl Corp. v. EPA, supra,* 176 U.S.App.D.C. at 409–411, 541 F.2d at 37–39. By contrast, such standards are breached only where the aggrieved parties are able to show an error of judgment so clear as to deprive the Agency's decision of a rational basis. *Ethyl Corp. v. EPA, supra,* 176 U.S.App.D.C. at 406–407, 541 F.2d at 34–35 n. 74. This would appear to require the aggrieved parties to demonstrate a complete lack of foundation for the Agency's conclusions. *Forshan v. Califano, supra,* 442 F.Supp. at 209, n. 9.

With these principles in mind, the Court will now briefly review the evidence.

*REVIEW OF THE EVIDENCE*

Even a cursory review of the evidence of this case will reflect that EPA, expressly or by implication, considered all the relevant factors enumerated above. The basic point of contention is whether EPA, having considered those factors, made

a clear error of judgment in ordering the emergency suspensions. Plaintiff's attack, in this regard, has focused on EPA's judgment regarding: (1) the probability that the public would suffer the threatened harm, and (2) the benefits from the continued use of 2,4,5–T and Silvex.

## A. *RISK—2,4,5–T*

As reflected above, EPA determined that there is a probability that spontaneous human abortions are associated with the spraying of 2,4,5–T and Silvex on the basis of two basic categories of data:

(1) evidence that 2,4,5–T, Silvex and their contaminant TCDD, are highly fetotoxic in animals; and

(2) the Alsea II Study, which concluded there was a statistically significant relationship between hospitalized spontaneous abortions and the spraying of 2,4,5–T.

Having reviewed the testimony and exhibits introduced at the hearing, as well as the relevant portions of the administrative record relied upon by the parties supporting and attacking the meaning of this data, the Court is unable to say that EPA made a clear error of judgment with regard to the probability that the uses in question of 2,4,-5–T and Silvex are associated with spontaneous human abortions. There is evidence in the record that the animal studies and the Alsea II Study, although certainly inconclusive, are nevertheless suggestive of the conclusions reached by EPA in this regard. The Court's analysis in this regard will focus on the principal arguments of the plaintiffs, which focus almost exclusively on the validity of the Alsea II Study, that EPA's conclusions are completely without foundation.

This attack has focused on the design of the study, data collection procedures, statistical interpretation of the date collected, the consistency of the results with those of other studies, and possible exposure of pregnant women in the Alsea Region to the spraying of 2,4,5–T. The Court notes at the outset, however, that plaintiffs concede that TCDD is extremely feto-toxic in certain animals.

### 1. *Study Design*

Plaintiffs' most serious attack on the Alsea II Study focuses on the fact that the study collected and compared data only with regard to hospitalized spontaneous abortions. In this regard, plaintiffs assert that many abortions are treated at physician offices and clinics and are not hospitalized. Plaintiffs assert, further, that spontaneous abortions are more likely to be hospitalized in the Study Area than the control area because physician practices vary between the two areas and that this fact, and not the spraying of 2,4,5–T, accounts for the higher incidence of spontaneous human abortions in the Study Area.

EPA frankly concedes that the Alsea II Study is based on the reasonable assumption that hospitalized spontaneous abortions occur at the same rate in the study and control areas. The Court agrees that the assumption is reasonable for two reasons. First, there is evidence in the record that to gather and compare data on all spontaneous abortions, not only hospitalized spontaneous abortions, would be extremely difficult and time-consuming. In this regard, the evidence reflects that hospital records provide a speedy, inexpensive and reliable source of spontaneous human abortions. A properly conducted, more thorough investigation would certainly have subverted EPA's desire to complete the Alsea II investigation before the onset of the March spraying season.

Second, plaintiffs' position that the use of only hospitalized spontaneous abortions introduced a significant bias into the Alsea Study is supported only by speculative opinion evidence. By contrast, plaintiffs have not produced in Court any hard data showing that the rate of hospitalization of spontaneous abortions in the study and control areas are not the same. In the absence of such data, the Court is unable to say that the assumption that spontaneous abortions are hospitalized at the same rate in the study and control areas is completely without foundation. Given the need for speed, the reliability of the data, and the plausibil-

ity of the hypothesis, and the absence of conclusive conflicting evidence, the Court believes this assumption is not only reasonable, but in total accord with the Congressional policies behind FIFRA.

### 2. Data Collection

Plaintiffs assert further that the Alsea II Study is flawed by improper data gathering procedures. Particularly, they assert that emergency room data on spontaneous abortions from one, but not all, of the hospitals included in the study were considered, that some hospitals would not provide all the requested information, that the recorded diagnoses were unreliable, and that many of the spontaneous abortions occurring in the Control Area were hospitalized in Idaho hospitals which were not included in the study.

Defendants introduced evidence at the hearing tending to cast doubt on the significance of all of the foregoing objections to the data-gathering procedures. Still, without question, these objections bring into question the credibility of the conclusions of the Alsea II Study. Nevertheless, because the objections are speculative and unsupported by hard data, they fall far short of demonstrating a complete lack of foundation for the conclusions reached in the Alsea II Study.

### 3. Statistical Interpretation of the Alsea II Data

Plaintiffs assert, by way of the affidavit of Dr. Mantel and the testimony of Dr. Downs, that the Alsea II data, accepted at face value, does not show, by using a simple chi-square test, that there is a statistically significant relationship between hospitalized spontaneous abortions and the spraying of 2,4,5–T. Further, plaintiffs claim that even if there is a statistically significant relationship between hospitalized spontaneous abortions and the spraying of 2,4,5–T, this is due to an aberrational number of abortions in the month of June, 1976, which can simply be dismissed as a random event. In addition, plaintiffs assert that any observed correlations can be attributed to such spurious factors as a greater proportion of child-bearing age women residing in the Study Area and an influx of temporary residents in the Study Area during the summer months. As a final matter, plaintiffs assail the supplementary three-year period analyses because they are based on estimated, not actual, data on live births.

The Court believes that these criticisms also call into serious question the conclusions reached in the Alsea II Report. Nevertheless, there was testimony introduced at the hearing that despite these significant pitfalls, the data in the Alsea II Report are suggestive of a link between the spraying of 2,4,5–T and spontaneous human abortions. With this testimony *before it, the Court must reluctantly conclude that EPA's partial reliance on the Alsea II Report was not a clear error of judgment or completely without foundation.

### 4. Inconsistency With Other Studies— Seveso, Italy

Plaintiffs also rely heavily on the argument that the Alsea II results are meaningless because they are inconsistent with the results of a study of an accident which occurred in Seveso, Italy. This argument is among those least troublesome to the Court.

In 1976, an accident occurred in Seveso, Italy which resulted in the exposure of large amounts of TCDD to the public. The data collected immediately after the accident did not on their face reflect a large increase in the number of spontaneous abortions occurring after the accident. An EPA expert testifying at the hearing frankly conceded that if the Alsea II conclusions are valid, one would expect a significant increase of spontaneous abortions in the Seveso Area.

The Court is reluctant to give serious weight to the studies following the Seveso incident, however. Testimony introduced by EPA brought out certain data gathering problems experienced by the Seveso researchers. Further, all the Seveso studies were not epidemiological in nature. Most importantly, however, the Court has received only second-hand, incomplete infor-

mation concerning the Seveso studies which the Court is reluctant to use as basis for determining that EPA made a clear error of judgment in issuing the emergency suspension orders.

### 5. Lack of Exposure to 2,4,5–T

Dow has presented the testimony of Dr. Gehring which reflects that pregnant women in the Alsea II Study Area possess a significant margin of safety from any possible exposure to the spraying of 2,4,5–T and that it is inconceivable that these women could be exposed to levels of TCDD significant enough to cause reproductive damage. In this regard, Dr. Gehring concedes that his findings are based on a determination of a no-effect dosage level of TCDD in humans.

This objection also gives the Court little trouble. There is adequate evidence in the record to show that a no-effect dosage level for TCDD has not been established. Without such a level, there is evidence in. the record that the calculations by Dr. Gehring are suspect.

In this connection, there is evidence in the record to show that pregnant women in the Study Area are potentially exposed to 2,4,5–T and TCDD through drinking water and food supplies, as well as a risk of dermal exposure. The Court believes that this evidence, together with evidence that a no-effect level for TCDD has not been established, are sufficient reasons to hold that EPA made no clear error of judgment in relying on the Alsea II conclusions due to lack of exposure to 2,4,5–T or TCDD. Compare Environmental Defense Fund v. EPA, supra, 167 U.S.App.D.C. at 77–81, 510 F.2d at 1298–1302; Environmental Defense Fund v. EPA, supra, 179 U.S.App.D.C. at 53–55, 548 F.2d at 1008–1010; Citizens Against Toxic Sprays, Inc. v. Bergland, 428 F.Supp. 908 (D.Or., 1977).

### B. RISK—SILVEX

EPA also relied on the Alsea II Report in deciding to issue an emergency ban of Silvex. This was based on the assumption that, because of the chemical similarity between 2,4,5–T and Silvex and the fact TCDD is present in both substances, one could reasonably expect the spraying of Silvex to have an association with spontaneous human abortions similar to the association found in the Alsea II Study between spontaneous human abortions and 2,4,5–T. In this connection, no epidemiological study was conducted to directly test a possible association between Silvex and spontaneous human abortions. As reflected above, however, EPA also relied on the animal studies in banning Silvex.

This hearing has dealt almost exclusively with the possible effects of 2,4,5–T, not Silvex. As a consequence, very little evidence has been received by the Court on the issue of whether EPA made a clear error of judgment or was completely without foundation in ordering the immediate suspension of Silvex.

The affidavits and briefs which have been received by the Court on this issue focus primarily on the alleged lack of exposure of humans to Silvex. The evidence presented on this issue by affidavit, however, is highly speculative and certainly falls far short of showing a complete lack of foundation for EPA's decision in this regard. There is minimal evidence in the record to support EPA's decision to immediately suspend Silvex and the Court is unable to say that EPA made a clear error of judgment regarding its possible risks.

### C. BENEFITS—2,4,5–T, SILVEX

Plaintiffs also challenge EPA's finding that the benefits of continued use of 2,4,-5–T and Silvex during the suspension process do not outweigh the potential harm to the public from such use. The responsibility to demonstrate that the benefits outweigh the risks is upon the proponents of continued registration. Environmental Defense Fund v. Environmental Protection Agency, supra, 167 U.S.App.D.C. at 81, 510 F.2d at 1302.

EPA based its decision that the benefits of continued use of 2,4,5–T and Silvex during the emergency suspension period are

outweighed by the risks on two basic factors: (1) the relatively short period in which the emergency suspension orders would be in effect (3½–4 months); and (2) the availability of adequate substitute alternatives for use during the emergency suspension period. EPA concluded that the benefits of continued use of 2,4,5–T and Silvex during the emergency suspension period were nominal and clearly outweighed by the risks of continued use.

EPA's assessment of the benefits of continued use of 2,4,5–T and Silvex was clearly rational. This benefits aspect was tangential to the major focus of the hearing and little supporting evidence was introduced on this issue by the plaintiffs. Further, the evidence which was introduced on this issue was primarily relevant to benefits of longer range than those expected in the 3½–4 month emergency suspension period. Significantly, plaintiffs introduced no evidence conclusively demonstrating the inadequacy of available alternate herbicides. EPA certainly made no clear error of judgment in its assessment of the benefits of the continued use of 2,4,5–T and Silvex during the emergency suspension period. Compare *Environmental Defense Fund v. Environmental Protection Agency, supra,* 179 U.S. App.D.C. at 55–57, 548 F.2d at 1010–1012; *Environmental Defense Fund v. Environmental Protection Agency, supra,* 167 U.S. App.D.C. at 81–82, 510 F.2d at 1302–1303.[1]

*CONCLUSION*

The Court believes that EPA has considered all the relevant factors and has not made a clear error of judgment in deciding to order the emergency suspension of 2,4,-5–T for forestry, rights-of-way, and pasture uses, and of Silvex for forestry, rights-of-

way, pasture, home and garden, aquatic weed control/ditch bank, and commercial/ornamental turf uses. The Court will therefore deny plaintiffs' motion to stay the emergency suspension orders of 2,4,5–T and Silvex. In this connection, however, the Court will frankly concede that it arrives at this decision with great reluctance and would not in its judgment have ordered the emergency suspensions on the basis of the information before the EPA. Nevertheless, EPA has been vested by Congress with broad powers in this area, and the Court is not empowered to substitute its judgment for that of EPA.

The motion to stay EPA's emergency suspension orders of February 28, 1979 is DENIED.

IT IS SO ORDERED.

---

1. In their pretrial memorandum, Dow argues that EPA's emergency suspension orders were arbitrary and capricious for the additional reason that EPA failed to respond on the record to certain adverse criticism of the Alsea II Study by EPA employees and contractors and because EPA failed to consult certain officials involved in the RPAR process regarding the propriety of ordering emergency suspensions of 2,4,5--T and Silvex. No testimony on this issue was introduced at the hearing and the Court

doubts whether Dow still presses this argument. Nevertheless, the cases relied upon by Dow in this regard, such as, *American Petroleum Institute v. Knecht,* 456 F.Supp. 889 (C.D. Cal.1978); *Silva v. Lynn,* 482 F.2d 1282 (CA 1, 1973); and *International Harvester Co. v. Ruckelshaus,* 155 U.S.App.D.C. 411, 478 F.2d 615 (1973), are readily distinguishable, and the Court rejects this argument under the circumstances of this case.